UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

<u>ONLINE PUBLICATION ONLY</u>

ERIC WILLIAMS,

                              Petitioner,

            - versus -

DALE ARTUS, Superintendent, Wende
Correctional Facility,

                        Respondent.

MEMORANDUM
<u>AND ORDER</u>
11-CV-5541 (JG)

APPEARANCES :

         JANE SIMKIN SMITH
               P.O. Box 1277
               Millbrook, New York  12545
               *Attorney for Petitioner*[1]

         THOMAS J. SPOTA
               District Attorney of Suffolk County
               Criminal Courts Building
               200 Center Drive
               Riverhead, NY  11901
         By:   Michael Blakey
               Assistant District Attorney
               *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

PRELIMINARY STATEMENT

         In the early morning hours of May 15, 2001, petitioner Eric Williams and his

girlfriend, Rebecca Madigan, were involved in a high-speed car chase.  Williams was driving his

car; Madigan was his passenger.  They were chasing a car driven by Melissa Singh; Candace

Arena and Melissa Weiner were her passengers.  A shot was fired from Williams's car at Singh's

---

[1]         I heard oral argument on the petition on July 12, 2012.  Williams appeared *pro se* by video
conference.  Following oral argument, I appointed counsel for Williams pursuant to the Criminal Justice Act, 18
U.S.C. § 3006(A), and ordered supplemental briefing.  I heard supplemental oral argument on February 8, 2013.

car, which lost control and crashed spectacularly, killing Arena and seriously injuring Singh and Weiner.

Williams was charged with depraved indifference murder, and the entire focus of the trial was who fired the shot: was it Williams or Madigan?  Madigan testified for the prosecution that it was fired by Williams.  According to both Madigan and Williams, Williams was angry at Weiner because she owed him approximately $300 for some cocaine; Weiner was supposed to sell the cocaine for Williams but she used it instead.  Williams and Madigan were chasing Weiner, who was riding in Singh's car.  Madigan testified that as she and Williams pursued Singh's car at a speed of 80-90 miles per hour, Williams reached out the driver's side window with his left hand and fired the shot.  For his part, Williams testified that Madigan, motivated by jealousy and a desire to both deal drugs for him and collect the debt owed to him, fired the shot out the passenger side window of the speeding car.

The trial was indisputably afflicted by serious error.  Specifically, in her direct examination, Madigan testified that Williams had told her on multiple occasions that "this isn't the first time he's killed somebody.  That he's done it before."  Tr. 1005.[2]  Even the prosecution now concedes that this testimony was so obviously inadmissible that it would have been "beyond the pale" to elicit it deliberately.  OA Tr. 13.[3]

The events that followed this testimony were unusual and remarkable.  The trial court strongly suggested that Madigan's testimony that Williams had admitted to committing an uncharged murder was so inflammatory that a mistrial would be warranted if the prosecutor had deliberately elicited it.  After some dissembling, the prosecutor made it clear that she had, in fact,

---

[2]    The entire state court record is filed as ECF Nos. 11-43.  I use "Tr." to denote the trial transcript, which is filed sequentially as ECF Nos. 21-34.  I refer to other portions of the state court record by the relevant ECF number.

[3]    I use "OA Tr." to denote the transcript from the oral argument on July 12, 2012.

deliberately elicited the testimony and indeed still thought it was admissible.  She also stated that the testimony was not that prejudicial because she intended to further elicit from Madigan that she did not know whether Williams had actually killed someone or was just saying he had.

Instead of declaring a mistrial, the trial judge, seemingly persuaded by this latter argument, decided the prosecutor could "soften[] the blow," Tr. 1009, of the "highly prejudicial" testimony, Tr. 1010, by allowing Madigan to testify that she had "no idea" (apart from the admission) whether Williams had in fact killed someone, Tr. 1011.

The trial judge then gave a curative instruction that was worse than the disease. In his instruction, he essentially informed the jury that it should decide if Madigan was telling the truth about Williams's admission to murder.  When defense counsel pointed out the defect in the curative instruction, the judge, after a testy exchange, alighted upon what he termed the "final explanation" to the jurors on the subject, informing them: "[Y]ou are to completely disregard what that witness said . . . .  It has no part in this case.  You are to completely disregard [it]."  Tr. 1022.

But that instruction did not keep the prejudicial evidence out of the case.  Within seconds of resuming direct examination, the prosecutor elicited the supposed "softening the blow" testimony that Madigan did not know if Williams's admissions to a prior uncharged murder were true.  Tr. 1023.  And later, when Williams testified in the defense case, he denied ever killing anyone or telling Madigan that he had.

Lastly, in a stunt that the prosecution now admits was "outrageous," OA Tr. 16, the prosecutor raised the issue a final time in summation.  Misstating the stricken evidence to Williams's disadvantage and using it to maximum prejudicial effect, the prosecutor flatly asserted to the jury that Williams had told Madigan that "he had killed people before."  Tr. 2063.

3

A person unfamiliar with our system would find it odd that the prosecution could candidly admit that beyond-the-pale prejudicial evidence was erroneously adduced at trial and that its prejudicial effect was made worse by an outrageously improper summation, yet still oppose relief that would have the simple effect of ordering a new, fairer trial. But under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it is not enough for Williams to show that the state court incorrectly rejected his claims that there were multiple constitutional defects in the state court proceedings. He must further show that there is "no *possibility* fair-minded jurists could disagree that the state court's decision conflicts with" Supreme Court case law. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (emphasis added). "If this standard is difficult to meet," the Court observed in *Harrington*, leaving little doubt that it is, "that is because it was meant to be." *Id.* at 783.

Few petitions can withstand the heavy weight of AEDPA deference to state court decisions that erroneously reject federal constitutional challenges to state court convictions. But in my view this is one of them, and so, for the reasons discussed below, I grant the petition.

BACKGROUND

A.   *The Offense Conduct*

The facts set forth here relate principally to the grounds for habeas relief I find meritorious, which are that Williams (1) was deprived of his right to a fair trial by (a) the prosecutor's misconduct in deliberately eliciting inadmissible evidence of a prior uncharged murder by Williams and (b) the inadequate curative instruction by the trial judge when striking that evidence, resulting in its improper admission into the record; and (2) received inadequate assistance of appellate counsel who failed to argue on direct appeal that trial counsel's failure to object to the prosecutor's use of Madigan's stricken testimony during summation constituted

4

ineffective assistance of counsel.  Williams has raised various other challenges to his conviction; the facts relating specifically to those claims are set forth where relevant in the "Discussion" section of this Memorandum and Order.

1.      *The Undisputed Facts*

The following facts were undisputed at trial.  Williams was a small-time drug dealer.  Tr. 998 (Madigan Test.), 1888 (Williams Test.).[4]  He was twenty-six years old at the time of trial.  Tr. 1874 (Williams Test.).  He had formerly served in the Army.  Tr. 1876 (Williams Test.).  He owned two guns that he kept in his apartment, a Ruger P 96 and a Hi-Point 9mm.  Tr. 1885 (Williams Test.).  He shot guns for target practice at his parents' house in upstate New York.  Tr. 1878 (Williams Test.).

At the time of the shooting, Weiner owed Williams approximately $300 for cocaine he had given her to sell.  Tr. 997 (Madigan Test.), 1883 (Williams Test.).  Weiner had used rather than sold that cocaine.  Tr. 997 (Madigan Test.).  Williams tried unsuccessfully to collect this debt and he became angry at Weiner.  Tr. 999-1000, 1002 (Madigan Test.), 1887 (Williams Test.).

Madigan, who was twenty-five at the time of trial, was dating Williams.  Tr. 993-94 (Madigan Test.).  Madigan also served in the military, but in the Air Force.  Tr. 1099-1100 (Madigan Test.).  She had experience firing weapons, including handguns.  Tr. 1076, 1095-98 (Madigan Test.).  She had previously fired Williams's handguns at his parents' house in upstate New York.  Tr. 1095-98, 1100-02, 1144-45 (Madigan Test.).

Madigan did not live with Williams but frequently stayed at his apartment.  Tr. 1081 (Madigan Test.).  She worked as a bartender on-and-off for five years, but was working for

---

[4]      The parenthetical identifies the individual whose testimony is being cited.  I omit the parenthetical where it is clear from context whose testimony is being cited.

a construction company at the time of trial.  Tr. 1072-73 (Madigan Test.).  She had a history of

multi-drug abuse.  Tr. 1073-74 (Madigan Test.).  She formerly accused an individual of rape but

subsequently walked away from the case.[5]  Tr. 1079 (Madigan Test.).

Madigan was aware of the debt that Weiner owed Williams.  Tr. 1886-87

(Williams Test.).  Once, when they were discussing the issue, Madigan said to Williams, "That's

what you get – that's because you let little sparkly bitches sell drugs for you."[6]  Tr. 1887

(Williams Test.).

In the early morning hours of May 15, 2001, Jose Morales, who was a friend of

Williams, Tr. 996 (Madigan Test.), called Williams and informed him that he had spotted Weiner

at a party, Tr. 1881-82 (Williams Test.).  Williams and Madigan then left together in search of

Weiner.  Tr. 1026 (Madigan Test.), 1889 (Williams Test.).  They found Weiner and two of her

friends, Singh and Arena, sitting in a car in the parking lot of a 7-11 on Deer Park Avenue.  Tr.

1031-32 (Madigan Test.), 1427-30 (Singh Test.), 1525-26 (Weiner Test.), 1890 (Williams Test.).

Singh was in the driver's seat, Arena was next to her in the front passenger seat, and Weiner was

behind Arena in the rear.  Tr. 1428-29 (Singh Test.), 1526 (Weiner Test.).

When Williams and Madigan arrived at the 7-11, Singh pulled out of the parking

lot and drove away.  Tr. 1033 (Madigan Test.), 1430-31 (Singh Test.), 1527-28 (Weiner Test.),

1891-93 (Williams Test.).  Williams and Madigan pursued them south down Deer Park Avenue,

then turned off and followed them through some residential neighborhoods, and then turned back

onto Deer Park Avenue headed south.  Tr. 1034-36 (Madigan Test.), 1431-35 (Singh Test.),

---

[5]      The record indicates a dispute over whether Madigan later recanted her accusation or simply abandoned the case.  Tr. 1079 (Madigan Test.).

[6]      Madigan testified that the phrase "sparkly bitches" or "sparkling bitches" was a joke between her and Williams:  "He had sparkles on his face one day.  And I made a comment, 'Oh, you hang out with sparkley [sic] bitches,' and whatever."  Tr. 1044 (Madigan Test.).  For his part, Williams testified that the phrase originated because Madigan once "noticed some sparkles on the couch which was something that Melissa [Weiner] used to wear as like a makeup."  Tr. 1887 (Williams Test.).

1893-96 (Williams Test.).  Williams was driving at a high speed, about 80 or 90 miles per hour,

down Deer Park Avenue.  Tr. 1036 (Madigan Test.), 1435 (Singh Test.), 1896-97 (Williams

Test.).

>        While both vehicles were racing down Deer Park Avenue, a gun shot was fired

from Williams's vehicle into Singh's vehicle.  Tr. 1037-38 (Madigan Test.), 1898 (Williams

Test.).  Singh lost control of the vehicle, which crashed into a train trestle and flipped over.  Tr.

1039-40 (Madigan Test.), 1898-99 (Williams Test.).  Arena died; Weiner and Singh were

seriously injured.  Tr. 895-900 (Treanor Test.), 1438-40 (Singh Test.), 1529-31 (Weiner Test,)

1822 (Wilson Test.).

>        Following the car crash, Williams and Madigan continued down Deer Park

Avenue and pulled into a parking lot of a supermarket.  Tr. 1041 (Madigan Test.), 1900

(Williams Test.).  They hid the gun in some bushes on a hill next to the supermarket.  Tr. 1041

(Madigan Test.), 1901-02 (Williams Test.).  They then drove to Williams's house and then to

Morales's house.[7]  Tr. 1042 (Madigan Test.), 1902-03 (Williams Test.).  Daniel Guercio, who

was another friend of Williams, met them at Morales's house.  Tr. 1043 (Madigan Test.), 1904

(Williams Test.).  Williams, Madigan, and Guercio then drove upstate for a few days to "lay

low" at Williams's parents' house in upstate New York.  Tr. 1045 (Madigan Test.), 1904-06

(Williams Test.).  They stopped on their way up to retrieve the gun they had hidden by the

supermarket.  Tr. 1046 (Madigan Test.), 1906 (Williams Test.).

>        Williams and Madigan initially believed that all three women had died in the car

crash.  Tr. 1050 (Madigan Test.), 1908 (Williams Test.).  When they returned from upstate New

York, Williams and Madigan learned from Morales that Weiner and Singh had survived the

---

[7]        Madigan testified that they drove to Morales's house, Tr. 1042, but Williams testified that they
actually drove to Morales's parents' house, Tr. 1903.

crash.  Tr. 1050-51 (Madigan Test.), 1908 (Williams Test.).  Williams and Madigan discussed

what to do about Weiner, who was in the hospital, and considered the prospect of killing her.  Tr.

1058-59 (Madigan Test.), 1908 (Williams Test.).  But then Williams went to speak with Weiner

and discovered that Weiner had little memory of what had occurred on the night of the shooting.

Tr. 1061-62 (Madigan Test.), 1533-34 (Weiner Test.).

Madigan continued to date Williams after the accident.  Tr. 1063-64 (Madigan

Test.).  She began staying with him every night.  Tr. 1084, 1136 (Madigan Test.).  The police

interviewed Madigan in January 2002 regarding the accident.  Tr. 1064 (Madigan Test.).

Williams and Madigan broke up a couple of months thereafter.  Tr. 1088 (Madigan Test.).

2.      *The Disputed Facts*

The state lacked forensic evidence that would indicate who had shot the gun from

Williams's car.[8]  Neither Singh nor Weiner could testify as to whether a gun had been fired at

the car, let alone who had fired the weapon.[9]  Tr. 1437-38 (Singh Test.); 1528-29 (Weiner Test.).

---

[8]      At trial, George Kristova, forensic examiner with the Suffolk County Crime Laboratory, testified regarding the trajectory of the bullet.  His testimony was confined to the observation that it was "a shot fired from . . . the right rear of [Singh's] vehicle."  Tr. 1766.  This general observation is consistent with the testimony of both Williams and Madigan.  Madigan testified that when Williams fired the gun, they "were almost . . . directly behind [Singh's car] with our noses touching the back" and that Singh's car was "in the left lane" and Williams's car was "in the right lane."  Tr. 1038 (Madigan Test.).  Williams testified that when Rebecca fired the gun, they were "behind and slightly to the right" of Singh's car and that Singh's car was straddling the right and left lanes and Williams's car was in the right lane.  Tr. 1947 (Williams Test.).  Either way, because Williams's car was behind Singh's car and some measure to the right of it, the shot would have come from "the right rear" of Singh's vehicle regardless of whether Williams or Madigan fired the gun.

In its briefing before this Court, the prosecution contends that "[t]he angle of the bullet's entry in Weiner's headrest was consistent with a shot from petitioner's driver seat, not Madigan reaching out and across the windshield."  Resp't Supp. Mem., at 10, ECF No. 49.  Not only does the testimony of Kristova fail to establish this fact, but the prosecution neither characterized it as such nor relied on this forensic testimony in arguing the harmlessness of any constitutional error in its briefing at the state level.  *See* Br. Resp't, August 15, 2007, at 26-28, 55-57, ECF No. 37, at 34-36, 63-65 (direct appeal); Br. Resp't, June 25, 2009, ECF No. 38, at 78-83 (writ of error *coram nobis*); Br. Resp't, May 21, 2010, ECF No. 39, at 84-93 (§ 440.10 motion).

[9]      Singh recalled Williams and Madigan chasing her and then right before the crash that "glass was on my face. . . . I thought it was like a glass bottle or something.  But I remember glass hitting my face.  And then I woke up under the car."  Tr. 1437.  Weiner could only recall pulling out of the 7-11, then driving "on [a] side street somewhere," and "then "[w]aking up in the hospital."  Tr. 1528-29.

Accordingly, the case against Williams boiled down to two competing versions of what

happened in Williams's car as Williams and Madigan pursued Singh's car.

        a.     *Madigan's Testimony about the Shooting*

        According to Madigan's version of events, when she and Williams left his home

in search of Weiner in the early morning of May 15, 2001, Williams took his gun with him.  Tr.

1026.  Once he and Madigan got into the car, Williams placed the gun in the waistband of his

pants.  Tr. 1027.  They drove southbound down Deer Park Avenue and then pulled into the 7-11.

Tr. 1032.  Williams pulled up next to Singh's car, jumped out of his car, and pulled open one of

the doors of Singh's car.  Tr. 1032.  Singh's car then pulled out of the 7-11 and drove away.  Tr.

1033.  As Singh's car drove away, Williams pulled out his gun and aimed it at the car but did not

shoot.  Tr. 1033.  Then Williams got back into his car and chased after Singh's car.  Tr. 1033.

        Madigan further testified that while they were chasing Singh's car, Williams had

the gun in his lap.  Tr. 1037.  As he pursued Singh's car through one of the residential

neighborhoods, he rolled down his window and aimed his gun out the window, but at Madigan's

insistence did not shoot.  Tr. 1037.  Once back on Deer Park Avenue, when Williams and

Madigan "were almost . . . directly behind [Singh's car]."  Tr. 1038.  Williams then "rolled down

the window[,] [s]tuck the gun out the window[,] . . . [a]nd held the gun out sideways and shot at

the girls."  Tr. 1038.  Williams shot once.  Tr. 1038.  Williams's car had a manual transmission

and a shift stick, requiring him to shift gears with his right hand and steer with his left hand.  Tr.

1122, 1128.

        b.     *Williams's Testimony about the Shooting*

        According to Williams's version of events, Madigan was jealous of Weiner.  Tr.

1887.  She mocked Williams for "hang[ing] out with little sparkly bitches," a phrase she coined

to describe Weiner, and regarded the debt Weiner owed Williams as "what you get . . . because you let little sparkly bitches sell drugs for you." Tr. 1887. Madigan also wanted to sell drugs for Williams and asked him, "How come you don't consign for someone like me? You give it to [Weiner] on consignment. You do it for her, but not for me." Tr. 1888. Madigan tried to convince Williams that she could collect Weiner's debt for him and asked him, "If I get the money from her, then you'd be able to give it to me on consignment?" Tr. 1888.

Williams testified that he did not take his gun with him and was not aware that Madigan had brought the gun when they left his house in search of Weiner. Tr. 1892-93, 1929, 1939. They drove southbound on Deer Park Avenue and pulled into the 7-11. Tr. 1890-91. Williams and Madigan both got out of the vehicle and approached Singh's car, which then sped out of the parking lot. Tr. 1891-92. Neither Williams nor Madigan had a gun in their hands as they approached Singh's car. Tr. 1891-93. Williams and Madigan then got back into Williams's car and chased after Singh's car. Tr. 1892.

Williams further testified that he chased Singh's car through the residential neighborhoods and back onto Deer Park Avenue. Tr. 1893, 1896. On Deer Park Avenue, Williams was driving "[w]ell over the speed limit," trying to shift gears and talking to Morales on his cellphone.[10] Tr. 1897-98. At some point, Williams "heard a pop" and "glanced over to [his] right." Tr. 1898. Madigan "had the gun out the window." Tr. 1898, 1919. Williams then glanced back in front of him and Singh's car "was actually out of control[,] . . . went across the road, [and] smashed into the abutment and launched up in the air." Tr. 1899.

---

[10]     Detective Ronald Tavares testified that Williams's cell phone had made phone calls to his friend Jose Morales "[p]rior to the incident and after the incident." Tr. 1698.

c.    *The Post-Crash Discussion Regarding Killing Weiner*

Williams admitted that when he and Madigan later learned that Weiner and Singh had survived the crash, he and Madigan broached the topic of killing Weiner.  Tr. 1908. Specifically, he testified that Madigan proposed disguising herself as a nurse and going into the hospital to kill Weiner.  Tr. 1908-11.  The prosecutor did not dispute that Madigan discussed this idea with Williams and, in fact, was prepared to elicit testimony from Madigan that she actually secured a hospital uniform.  Tr. 1052-53.  The prosecutor did dispute the defense's assertion that Madigan came up with the idea to disguise herself and enter the hospital to kill Weiner, countering that she was simply following orders from Williams.  Tr. 1052-53.

B.    *The Trial Court Proceedings*

Williams was arraigned on June 24, 2002 on an indictment for murder in the second degree, assault in the first degree (two counts), criminal use of a firearm in the first degree, and criminal possession of a weapon in the second degree.  Answer ¶ 4, ECF No. 10.

1.    *Evidence that Williams Had Committed a Prior Uncharged Murder*

During Madigan's testimony, the prosecutor elicited evidence that Williams had committed a prior uncharged murder.  The exchange went as follows:

> Q:    Other than your witnessing him fire the handguns at his parents[' house], did he ever tell you about any other experience he may have had with firearms?
>
> A:    Yes.
>
> Q:    What was that?
>
> A:    A few occasions he said that this isn't the first time that he's killed somebody.  That he's done it before.

Tr. 1005.

Defense counsel immediately objected and moved for a mistrial outside the presence of the jury on the grounds of unfair prejudice and prosecutorial misconduct. Tr. 1006-07. Defense counsel stated that none of Madigan's prior statements, which had been disclosed to the defense, suggested that she would respond in that manner. Tr. 1006. The prosecutor responded that "[Madigan] was going to indicate that she doesn't know any of that is true." Tr. 1007. The trial court then asked the prosecutor whether Madigan had told her that answer in the past, and the prosecutor stated, "I was asking [Madigan] more of [Williams's] military experience." Tr. 1007. She then elaborated:

> If I can indicate further with regard to [Madigan's] testimony, she is going to testify that the defendant told her all sorts of things like that. She has no idea whether they're true or not. But these are things he told her.
>
> One of the main reasons why she never came forward with this information is because she was afraid of him. That's what she was afraid of. She doesn't know whether it's true.

Tr. 1008. Following this representation, defense counsel withdrew his objection based on prosecutorial misconduct but maintained his objection on the ground of unfair prejudice. Tr. 1008-10. The prosecutor then stated:

> Again I would indicate for the record that I was aware from her that she has told me that the defendant told her all sorts of things about all sorts of things that he's been involved with. And that's the main reason why she was afraid of him and didn't come forward.
>
> That certainly is relevant I think in explaining to the jury as we go on why this girl never came forward and said anything.
>
> In regard to that answer, I was looking for military experience. I can't tell the court eventually she wasn't going to talk about some of the things the defendant told her after this happened. I still think some of it is relevant.

12

> I'm going to ask her, "You don't know any of that [sic] true." But certainly these are things that he was speaking about and bragging about afterwards. It's certainly relevant to her in terms of the way she behaved after this incident.

Tr. 1010.

The trial court denied the motion for mistrial while admitting that "it's a close question." Tr. 1011. The trial court then explained:

> Seems to me we have to put it in the whole context what she's going to be testifying about.
>
> If there are follow-up questions which reveal she has no idea whether those events ever occurred, it softens the blow. Initially I agree with [defense counsel]. But if we let things stand just as they are now, then I think there is really prejudice. When we look at her whole testimony, not only continued direct, but cross-examination, then I think it might not be as bad as it appears to me.

Tr. 1011-12. Defense counsel then requested a curative instruction, while stating his position that a curative instruction would not overcome the prejudice to Williams. Tr. 1012. When the jury returned, the trial court instructed:

> [T]here was testimony from a witness just now. I don't know what the basis for it was. But testimony from this witness which referred to other crimes. You heard it. I can't ask you – I'm going to ask you to put it out of your mind. I can't ask you to take it back. It's like ringing a bell and trying to unring it.
>
> . . . I have no idea if she has any basis for making those statements. No idea at all.
>
> Now, I presume her credibility will be attacked on cross-examination. But that's in the future. [Defense counsel] is a very skilled lawyer.
>
> But my point is that she has said something that has no place at all in this courtroom. No place at all. And I'm asking you to take that instruction very carefully. Very carefully. And we'll try to pick up where we left off here. We'll have her back.

13

> Look, when you're finally determining whether you believe or not
> her testimony . . . what do you do when you're trying to discern
> whether a particular witness is telling the truth?  What are the
> things you look at?  Credibility.  Do you consider past conduct,
> past convictions?  All those questions were aimed at what we're
> doing now.
>
> You the jury, how do you discern whether a particular witness
> is telling the truth?  Is there any basis for making those statements?
> Is there any basis for making the statements she has when she
> testifies?

Tr. 1014-15.

Defense counsel objected to this curative instruction on the ground that the trial

court had suggested to the jury that "they can conclude, if they believe [Madigan], they can

believe [Williams] previously killed someone" and requested that the trial court instruct the jury

that "they should not consider that statement for the truth of it."  Tr. 1017-18.  A heated

exchange between defense counsel and the trial court ensued.  Tr. 1017-21.  The trial court then

issued a second curative instruction to the jury: "If there is any doubt in your mind, I thought I

told you specifically and clearly you are to completely disregard what that witness said – okay? –

just before we broke. . . .   It has no part in this case.  You are to completely disregard."  Tr.

1022.

Several questions following the trial court's curative instructions, the prosecutor

asked Madigan, "Did [Williams] ever discuss with you whether he had any firearms training in

the military," to which Madigan responded, "Yes."  Tr. 1023.  The prosecutor then asked, "The

other things that he was telling you, you don't know any of those things to be true, do you, just

what he told you?"  Tr. 1023.  Madigan responded, "That's all I know is what he told me."  Tr.

1023.  Defense counsel did not object to the prosecutor's return to Madigan's stricken testimony.

Later, defense counsel also returned to the stricken testimony during his direct

examination of Williams:

> Q:      You heard Rebecca [Madigan] testify here last week that
> you told her you had killed a couple of people while you were in
> the service.  Is that correct?
>
> A:      I never told her anything like that.  I heard her testimony.
> Yes.
>
> Q:      When you were in the service, did you ever see combat?
>
> A:      No.
>
> Q:      Did you ever kill a person when you were in the military?
>
> A:      I never killed a person in my whole life.

Tr. 1921.  The prosecutor circled back to this testimony while cross-examining Williams, asking

him, "Did you tell [Weiner] similar stories that you told Rebecca [Madigan] that you killed

people before?," to which Williams responded, "No."  Tr. 1926.

> 2.      *The Prosecution's Summation*

During summation, the prosecutor again returned to testimony by Madigan that

the trial had instructed the jury to disregard:

> [Madigan] tells you she was scared of him.  She owed him money.
> She bec[a]me more scared because he told her stories.  Those were
> her words.  Just like [Madigan] said.  I don't remember [Madigan]
> saying he killed anybody in the service.  She said, "He told me he
> killed people before."

Tr. 2063.  Defense counsel did not object to the prosecutor's use (or distortion) of the stricken

testimony in her summation.

3.      *The Verdict and the Sentencing*

After an approximately two-week jury trial,[11] the jury found Williams guilty of murder in the second degree, assault in the first degree (two counts), criminal use of a firearm in the first degree, and criminal possession of a weapon in the second degree.[12]  Tr. 2123-24; Sentence & Commitment ("S&C"), ECF No. 35, at 39.  Williams was sentenced to an indeterminate term of 25 years to life on the top count, plus an additional five years to run consecutively for criminal use of a firearm,[13] resulting in an aggregate sentence of 30 years to life.  *See* S&C, ECF No. 35, at 39.

C.      *The Direct Appeal*

Williams appealed his convictions to the Appellate Division of the Supreme Court of New York, Second Department.  Br. Def.-Appellant, Mar. 22, 2007, ECF No. 36.  Williams asserted three arguments on appeal.  First, he argued that the trial court conducted a material stage of the trial in his absence – a January 27, 2003 conference where his newly-retained counsel replaced his appointed counsel and requested an adjournment of trial.  *Id*. at 55-64, ECF No. 36, at 70-79.  Second, he argued that the trial court failed to grant a mistrial or, in the alternative, to issue appropriate curative instructions after the improper admission of evidence that (a) Williams was serving a 30-month sentence on federal charges at the time of his state trial; (b) a 9mm pistol had been recovered from Williams's car during an unrelated traffic stop; and (c) Williams had told Madigan about a prior uncharged murder.  *Id*. at 65-97, ECF No. 36, at 80-112.  Third, Williams argued that the prosecutor engaged in misconduct by (a) informing the

---

[11]      The trial began on January 31, 2003 and ended on February 20, 2003 but was adjourned from February 14, 2003 until February 19, 2003.  *See* Trial Sheet, ECF No. 35, at 2-30.

[12]      The jury deliberated for a little over three hours before returning its verdict.  *See* Tr. 2115 (began deliberations at 12:22 pm), 2122 (returned verdict at 3:48 pm).

[13]      The state court imposed a determinate fifteen-year sentence for Williams's conviction for criminal use of a firearm.  *See* S&C, ECF No. 35, at 39.  Although the S&C instructs that all sentences shall run concurrently with each other, *see id.*, the state court orally ruled at sentencing that five of those fifteen years would run consecutively to the 25-years-to-life sentence, as required by statute, *see* Sentencing Tr. 35, ECF No. 35, at 74.

16

jury during her opening statement and improperly eliciting evidence that Williams was in federal custody and (b) improperly eliciting evidence from Madigan that Williams had admitted to a prior uncharged murder.  *Id*. at 97-103, ECF No. 36, at 112-18.

The Appellate Division affirmed the convictions on April 1, 2008.  *People v. Williams*, 854 N.Y.S.2d 542 (App. Div. 2008).  With respect to Williams's first argument on appeal, the court ruled: "The defendant's contention that he was denied his right to be present at an adjourned proceeding date is without merit because the proceeding at issue involved only questions of law and procedure."  *Id*.  With respect to Williams's third argument on appeal, the court held:

> While the better course would have been for the prosecutor to have obtained a ruling from the trial court regarding the admissibility of all testimony she sought to elicit from the People's witnesses regarding the defendant's prior uncharged crimes before such evidence was introduced into the case, any resultant error was harmless.

*Id*.  The court dismissed Williams's "remaining contentions [as] without merit."  *Id*.

Williams sought leave to appeal to the New York State Court of Appeals. Williams Appl. Leave Appeal, ECF No. 37, at 96-101.  His application was denied on August 28, 2008.  *People v. Williams*, 11 N.Y.3d 742 (2008) (Kaye, J.).  Williams then applied for reconsideration of the order denying leave to appeal, Williams Appl. Recons., ECF No. 37, at 120-22, which was denied on October 22, 2008, *People v. Williams*, 11 N.Y.3d 836 (2008) (Kaye, J.).

17

D.      *State Collateral Proceedings*

      1.      *The Petition for a Writ of Error* Coram Nobis

    On April 2, 2009 Williams filed a *pro se* petition for a writ of error *coram nobis* in the Appellate Division of the Supreme Court of New York, Second Department.  Br. Def.-Appellant, Apr. 2, 2009, ECF No. 38.  Williams asserted two arguments in his petition.  First, he asserted that his appellate counsel had failed to argue that Williams had received ineffective assistance from his trial counsel.  The asserted deficiencies of Williams's trial counsel were the failures to: (1) adequately prepare for trial; (2) object when the prosecution commented during summation on Madigan's stricken testimony regarding Williams's admission to a prior uncharged murder; (3) interview the detectives who interviewed the witnesses for the prosecution and call these detectives to testify; (4) investigate the physical evidence and call ballistics and accident reconstruction experts to testify; and (5) raise a defense to the state's evidence.  *Id.* at 10-35, ECF No. 38, at 14-40.  In addition, Williams asserted that appellate counsel failed to argue on appeal that the trial court erred in setting a trial date just four days following the substitution of Williams's appointed counsel with newly-retained counsel, who had no opportunity to conduct an adequate investigation.  *Id.* at 35-39, ECF. No. 38, at 40-44.

      The Appellate Division denied the petition on September 15, 2009, stating without explanation that Williams had "failed to establish that he was denied the effective assistance of appellate counsel."  *People v. Williams*, 65 A.D.3d 1173 (App. Div. 2009).  Williams sought leave to appeal to the New York State Court of Appeals.  Williams Appl. Leave Appeal, ECF No. 39, at 4-5.  That application was denied on December 14, 2009.  *People v. Williams*, 13 N.Y.3d 911 (2009) (Ciparick, J.).

2.       *The Motion to Vacate the Judgment*

On February 11, 2010 Williams moved *pro se* to vacate his judgment of

conviction pursuant to § 440.10 of the New York Criminal Procedure Law.  § 440.10 Motion,

ECF No. 39, at 10.  Williams asserted two arguments in his motion.  First, Williams argued the

existence of newly discovered evidence in the form of (1) an affidavit by Daniel Guercio stating

that Madigan, not Williams, had admitted to shooting the car, and (2) an affidavit by Marc

Williams stating that he had overheard Williams's defense counsel falsely advise Williams that a

lesser included offense of manslaughter would carry a maximum penalty of 25 years.  *Id*. at 17-

23, ECF No. 39, at 26-32.  Second, Williams argued that he received ineffective assistance from

his trial counsel.  The purported deficiencies of Williams's trial counsel were the failures to: (1)

properly advise him on the maximum sentencing exposure for a lesser included offense of

manslaughter; (2) adequately investigate the case prior to trial; and (3) introduce competing

expert witness testimony for the defense.  *Id*. at 24-34, ECF No. 39 at 33-43.

On November 16, 2010 Judge W. Gerard Asher of the County Court for Suffolk

County issued a decision on the motion, but he apparently failed to give the decision to either the

Clerk's Office or the District Attorney's office.  Answer ¶ 112.  The Clerk of the Court

subsequently transferred the case to Judge Martin Efman, who was also unaware of Judge

Asher's November 16, 2010 decision.  *Id*. ¶ 113.  On March 21, 2011 Judge Efman issued an

order directing the District Attorney to produce three portions of the trial transcript.  Order,

*People v. Williams*, No. 1289-2002 (N.Y. Cnty. Ct., Suffolk Cnty., Mar. 21, 2011), ECF No. 40,

at 26.  Thereafter, Judge Efman was made aware of Judge Asher's decision and declined to issue

a superseding decision.  Answer ¶ 114.

19

Judge Asher's decision denied Williams's § 440.10 motion.  Decision and Order, *People v. Williams*, No. 1289-2002 (N.Y. Cnty. Ct., Suffolk Cnty., Nov. 16, 2010), ECF No. 40, at 19-22.  He rejected Williams's claim that Guercio's affidavit constituted "newly discovered evidence," finding it "contradicts [n]either his testimony [n]or the original affidavit he gave to police in November 2001."[14]  *Id*. at 3, ECF No. 40, at 67.  The court also rejected Williams's claim of ineffective assistance of trial counsel, holding that "defense counsel was a strong advocate for defendant," and that "[t]he record proves that defendant received effective representation by counsel under both the Federal and State standards."  *Id*. at 5, ECF No. 40, at 69.

On April 12, 2011 Williams submitted an application to the court requesting reconsideration of its decision to deny his § 440.10 motion.  Williams Appl. Recons., ECF No. 40, at 28-34.  On June 23, 2011 the court reconsidered Williams's § 440.10 motion but denied it on the merits.  Decision and Order, *People v. Williams*, No. 1289-2002 (N.Y. Cnty. Ct., Suffolk Cnty., June 23, 2011) (Efman, J.), ECF No. 43, at 24-29.  The court held that Guercio's affidavit failed to constitute "newly discovered evidence."  *Id*. at 26.  It further held that Williams's claim of ineffective assistance of trial counsel was procedurally barred as Williams "could have raised this issue in his direct appeal but did not do so."  *Id*. at 27.  Furthermore, the court held that Williams's claims that "trial counsel was deficient are both contradicted by the record at trial and unsupported by credible evidence."  *Id*. at 28.

---

[14]     The court did not address Williams's claim of newly discovered evidence in the form of an affidavit by Marc Williams.

On April 29, 2011 Williams sought leave to appeal to the Appellate Division of the State of New York, Second Department.  Answer ¶ 117.  That application was denied on June 27, 2011.[15]  Decision and Order, *People v. Williams*, No. 1289-02, ECF No. 43, at 31.

E.    *The Instant Petition*

Williams filed his habeas petition on November 18, 2011.  In his petition, Williams asserts that he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 on the following grounds: (1) his absence from a critical stage of his trial; (2) a double jeopardy violation; (3) the improper admission of evidence; (4) prosecutorial misconduct; (5) newly discovered evidence; (6) ineffective assistance of trial counsel; (7) ineffective assistance of appellate counsel; and (8) the cumulative effect of these errors.  I heard oral argument on the petition on July 12, 2012.  Williams appeared by video conference.  Following oral argument on July 12, 2012, I appointed counsel for Williams pursuant to the Criminal Justice Act, 18 U.S.C. § 3006(A), and ordered supplemental briefing.  I heard supplemental oral argument on February 8, 2013.

---

[15]    The Appellate Division denied leave to appeal from Judge Asher's decision denying Williams's § 440.10 motion, rather than Judge Efman's decision upon reconsideration.  Its order was issued four days after the County Court filed Judge Efman's order denying the motion for reconsideration.

DISCUSSION

A.   *Legal Standards*[16]

Under AEDPA, federal habeas relief is available when a "person in custody pursuant to the judgment of a State court . . . is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A federal habeas court may grant habeas relief "with respect to a[] claim that was adjudicated on the merits in State court proceedings" only if the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[17]  28 U.S.C. § 2254(d).  In addition, a federal habeas court must presume all state court factual determinations to be correct, unless the petitioner rebuts the findings by clear and convincing evidence.  *Id.* § 2254(e)(1).  AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision.  *See Harrington*, 131 S. Ct. at 785; *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

---

[16]   Because neither party has suggested that it is in dispute, I do not address the timeliness of Williams's petition.  As part of AEDPA, Congress enacted a one-year statute of limitations for federal habeas petitions brought by state prisoners.  *See* 28 U.S.C. § 2244(d)(1).  This limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  *Id.* § 2244(d)(1)(A).  When a defendant does not file a petition for a writ of certiorari with the Supreme Court, the conviction becomes final 90 days after the New York Court of Appeals denies leave to appeal, *i.e.*, when the time for seeking a writ of certiorari has expired.  *Fernandez v. Artuz*, 402 F.3d 111, 112 (2d Cir. 2005); *Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001).  However, AEDPA tolls the limitations period for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending."  28 U.S.C. § 2244(d)(2).  From my review of the file, it appears Williams's conviction became final on November 27, 2008, *i.e.*, 90 days after a judge of the New York Court of Appeals denied him leave to appeal on August 29, 2008.  The limitations period was tolled during the pendency of Williams's *coram nobis* petition (*i.e.*, from April 2, 2009 until December 14, 2009), and then again during the pendency of Williams's § 440.10 motion (*i.e.*, from February 11, 2010 until June 27, 2011).  Because Williams's federal habeas petition was filed on November 2, 2011, it appears that fewer than 365 untolled days passed between his conviction becoming final and the filing of his petition in this Court.

[17]   This limitation on relief is frequently referred to as "AEDPA deference."  *E.g.*, *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410 (2011); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).

The Supreme Court has interpreted the phrase "clearly established Federal law" to mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* Elaborating on the "unreasonable application" standard, the Supreme Court has held that a habeas court may only "issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[18] *Harrington*, 131 S. Ct. at 786.

B.      *Analysis*

1.      *Williams's Meritorious Claims for Habeas Relief*

I grant Williams's petition for habeas relief on the following grounds. First, I find that Williams was deprived of his right to a fair trial by (a) the prosecutor's misconduct in deliberately eliciting inadmissible evidence of a prior uncharged murder by Williams and (b) the inadequate curative instruction by the trial court when striking that evidence, resulting in its improper admission into the record. Second, I find that Williams was deprived of effective assistance of appellate counsel. Appellate counsel should have argued that trial counsel's failure

---

[18]      Several of Williams's claims suffer either from a failure to properly exhaust or procedural default. Those legal standards will be discussed as relevant below. However, the claims on which relief is granted here were indisputably exhausted and denied on the merits in state court.

to object to the prosecutor's use of the stricken testimony during summation constituted inadequate assistance of trial counsel.

>    a.    *Deprivation of the Right to a Fair Trial*

>        (1)    *Improper Elicitation of Evidence of a Prior, Uncharged Murder*

Williams asserts that the prosecutor improperly elicited testimony from Madigan that Williams had admitted to a prior uncharged murder.  As set forth in the statement of facts above, when the prosecutor asked Madigan on direct examination, "[D]id [Williams] ever tell you about any other experience he may have had with firearms?," Madigan responded that, "A few occasions he said that this isn't the first time that he's killed somebody.  That he's done it before."  Tr. 1005.  Defense counsel objected and moved for a mistrial outside the presence of the jury on the grounds of unfair prejudice and prosecutorial misconduct.[19]  Tr. 1006-07. Williams raised this claim on direct appeal, which was denied by the Appellate Division on the merits:

> While the better course would have been for the prosecutor to have obtained a ruling from the trial court regarding the admissibility of all testimony she sought to elicit from the People's witnesses regarding the defendant's prior uncharged crimes before such evidence was introduced into the case, any resultant error was harmless.

*Williams*, 854 N.Y.S.2d at 542.

The appropriate standard of review for a habeas corpus claim alleging prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power."  *Floyd v. Meachum*, 907 F.3d 347, 353 (2d Cir. 1998) (citing *Darden v.*

---

[19]    Williams's defense counsel at trial later withdrew his motion for a mistrial on the ground of prosecutorial misconduct.  Tr. 1008-09.  However, Williams raised this claim of prosecutorial misconduct on direct appeal and it was resolved on the merits by the Appellate Division, so I conclude that this claim is not procedurally defaulted.  At oral argument on July 12, 2012, respondent's counsel agreed with this conclusion.  OA Tr. 26.

*Wainwright*, 477 U.S. 168, 181 (1986)).  The petitioner must demonstrate that the alleged

misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of

due process.'"  *Parker v. Matthews*, 132 S.Ct. 2148, 2143 (2012) (quoting *Darden*, 477 U.S. at

181).  The court must look at the totality of the circumstances in deciding whether the

egregiousness of the prosecutor's alleged misconduct justifies relief.  *United States v. Young*, 470

U.S. 1, 11-12 (1985) (noting the importance of context, including defense counsel's conduct).  In

the Second Circuit, this inquiry includes three factors: (1) the severity of the prosecutor's

misconduct, (2) any curative measures taken by the court; and (3) the certainty of the conviction

without the prosecutor's comments.  *See, e.g.*, *United States v. Melendez*, 57 F.3d 238, 241 (2d

Cir. 1995); *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994); *Floyd*, 907 F.2d at 355.  Standing

alone, prosecutorial misconduct is insufficient to overturn a conviction.  *Duran v. Miller*, 322 F.

Supp. 2d 251, 259 (E.D.N.Y. 2004).

      During oral argument on July 12, 2012, the prosecution admitted that if

Madigan's testimony was deliberately elicited, it would have been "beyond the pale," OA Tr. 13,

but argued that such testimony was not "a deliberate elicitation," but "volunteered information,"

OA Tr. 10.  This position is clearly belied by the trial transcript.  Upon defense counsel's motion

for a mistrial, the prosecutor's first reaction was to respond, "[Madigan] was going to indicate

she doesn't know any of that is true."  Tr. 1007.  Obviously the prosecutor had expected the

challenged testimony, since her position was that Madigan would blunt its prejudicial effect by

further testifying that she did not know whether the statements she attributed to Williams were

true.

      The prosecutor's subsequent comments further strengthen this conclusion.

Indeed, they indicate that she not only expected this testimony, but also believed it to be relevant

and admissible even after defense counsel's objection.  Just a few moments after the objection,

she stated, "If I can indicate further with regard to her testimony, she is going to testify that the

defendant told her all sorts of things like that.  She has no idea whether they're true or not.  But

these are things he told her."  Tr. 1008.  And later, she stated,

> Again I would indicate for the record that I was aware from her
> that she has told me that the defendant told her all sorts of things
> about all sorts of things that he's been involved with.  And that's
> the main reason why she was afraid of him and didn't come
> forward.
>
> That certainly is relevant I think in explaining to the jury as we go
> on why this girl never came forward and said anything.
>
> In regard to that answer, I was looking for military experience.  I
> can't tell the court eventually she wasn't going to talk about some
> of the things the defendant told her after this happened.  I still think
> some of it is relevant.
>
> I'm going to ask her, "You don't know any of that [sic] true."  But
> certainly these are things that he was speaking about and bragging
> about afterwards.  It's certainly relevant to her in terms of the way
> she behaved after this incident.[20]

Tr. 1010.  Together, these statements lead to the inescapable conclusion that the prosecutor not

only knew that Madigan would accuse Williams of admitting to an uncharged murder, but also

planned ahead of time to elicit that testimony in her direct examination of Madigan.

       In determining whether this amounted to an error of constitutional magnitude, I

must first consider the severity of the prosecutor's misconduct.  The prosecution itself now

---

[20]    Madigan's testimony regarding the arc of her relationship with Williams undermines the trial
prosecutor's assertion that Madigan was too afraid to come forward.  Following the shooting, she continued to see
Williams and began staying with him every night.  Tr. 1063-64, 1084, 1136 (Madigan Test.).  Although their
relationship was punctuated by several breaks, they did not permanently break up until some time after the police
interviewed Madigan in January 2002.  Tr. 1087-88 (Madigan Test.), 1917 (Williams Test.).  Furthermore, the
prosecution has never argued, in its briefing at the state level or before this Court, that the elicitation of this
testimony was admissible to prove Madigan's fear of Williams.  Rather, it has admitted that any deliberate
elicitation of this testimony would have been "beyond the pale."  OA Tr. 13.

admits that the deliberate elicitation of such evidence was "beyond the pale."  OA Tr. 13.

Moreover, the prosecutor's misconduct was significantly compounded by her reference to

Madigan's testimony throughout the trial.  Several questions following the court's issuance of

curative instructions striking this evidence, the prosecutor returned to this very testimony in the

following exchange:

> Q:      Did [Williams] ever discuss with you whether he had any
> firearms training in the military?
>
> A:      Yes.  It's mandatory.
>
> . . .
>
> Q:      The other things that he was telling you, you don't know
> any of those things to be true, do you, just what he told you?
>
> A:      That's all I know is what he told me.

Tr. 1023.  Later, while cross-examining Williams, the prosecutor asked, "Did you tell [Weiner]

similar stories that you told Rebecca [Madigan] that you killed people before?"[21]  Tr. 1926.

But the most disturbing reference to Madigan's testimony occurred during the

prosecutor's summation, when she stated, "Just like Rebecca said.  I don't remember Rebecca

saying he killed anybody in the service.  She said 'He told me he killed people before.'"[22]  Tr.

2063.  This statement twisted Madigan's words in a manner that amped up their prejudicial

---

[21]     As I discuss below, *see infra* pp. [ ]-[ ], one of the other defects in the trial is that the trial court's handling of the challenged testimony by Madigan included an improper suggestion that the prosecution could continue to broach this testimony as a way of "soften[ing] the blow," Tr. 1011-12.

[22]     The prosecutor's statement that "I don't remember Rebecca [Madigan] saying [Williams] killed anybody in the service" further buttresses the conclusion that she had deliberately elicited Madigan's testimony.  During the discussion immediately following defense counsel's motion for a mistrial, the prosecutor suggested that her question to Madigan was "asking her more of his military experience."  Tr. 1007.  That momentary effort to defend her actions was undercut by the fact that the question itself suggested no such limitation and by the prosecutor's alternate arguments that she intended to "soften the blow" of the testimony and that the testimony was relevant.  But her statement during summation hammers home the point that the prosecutor was not intending to ask about Williams's military experience and was not caught unaware by Madigan's response.

effect.  Madigan testified that Williams had informed her that "he's killed *somebody*."  Tr. 1005
(emphasis added).  But the prosecutor recounted Madigan as testifying that "he killed *people*
before."  Tr. 2063 (emphasis added).  The express incorporation of Madigan's testimony into the
summation drew the jury's attention back to this stricken evidence and encouraged it to rely
upon such evidence in rendering its verdict.[23]

        The second factor I must consider is any curative measures taken by the court.
The trial court did issue curative instructions following the elicitation of Madigan's testimony.
However, as discussed in further detail below, *see infra* pp. [ ]-[ ], the first of these instructions
was confusing and vague, suggesting to the jurors that the prejudicial weight of Madigan's
testimony would be impossible to disregard[24] – "I can't ask you to take it back.  It's like ringing
a bell and trying to unring it." – and that they might ultimately consider the statement for its truth
– "You the jury, how do you discern whether a particular witness is telling the truth?  Is there
any basis for making those statements?  Is there any basis for making the statements she has
when she testifies?"  Tr. 1014-15.   Moreover, these instructions were significantly undercut by
the prosecutor's later references to Madigan's testimony throughout the remainder of the trial, as
discussed above.

        The third and final factor I must consider is the certainty of Williams's conviction
absent the prosecutor's misconduct.  The trial record indicates that without the prosecutor's
improper elicitation of Madigan's testimony and repeated references to it, the conviction of

---

[23]    Williams raised the prosecutor's reference to Madigan's testimony in her summation as a separate
basis for his claim of prosecutorial misconduct.  That basis was unexhausted.  However, I must undertake a context-
specific inquiry in determining the severity of prosecutorial misconduct – here, the improper elicitation of
Madigan's testimony.  Accordingly, I may consider whether this effect was exacerbated by the prosecutor's
reference to it during her summation.  During oral argument on July 12, 2012 respondent's counsel conceded that I
may properly consider whether the improper elicitation of Madigan's testimony was exacerbated at summation in
the context of the harmless error inquiry.  OA Tr. 16.

[24]    Prior to issuing the curative instruction, the trial court admitted its unease about the potential for
the instruction to draw further attention to the prejudicial evidence.  Tr. 1012 ("As I said, the problem that every
judge is faced with asking to give curative instruction is calling attention to it again.  I'll do the best I can.").

Williams was far from certain.  Madigan's testimony was critical to the state's case.

Importantly, she was the only eyewitness to Williams's actions during the pursuit of the three

victims.  Madigan testified that Williams took the gun with him when they left the house to find

Weiner; that he put the gun in his pants when they got in the car; that he pulled out the gun in the

7-11 parking lot; that he put the gun back in his lap when he got back in the car; and that, while

chasing the victims, he "rolled down the window[,] [s]tuck the gun out the window . . . [a]nd

held the gun out sideways and shot at the girls."  Tr. 1026-27, 1033, 1037-38.  She then testified

that after Williams fired the shot, "The car [ahead] immediately started to shake.  And looked

like it was going out of control. . . .  And it smashed into the cement part of the train trestle."  Tr.

1039.

      Williams countered Madigan's testimony with a different version of events.  He

testified that he left the house without his gun; that he was simultaneously "talking on the phone"

and "[t]rying to drive stick" while giving chase to the victims; that he "heard a pop;" that he saw

Madigan with "the gun out the window;" and that when he glanced back at the road, the car in

front of him "went across the road, smashed into the abutment and launched up in the air."  Tr.

1886, 1897-98.  Detective Ronald Tavares testified that Williams's cell phone had made phone

calls to his friend Jose Morales "[p]rior to the incident and after the incident."  Tr. 1698.

      Madigan's testimony was corroborated by two witnesses for the prosecution,

Daniel Guercio and Jose Vanderlinde, who both testified to admissions by Williams that he fired

the gun following the incident.  However, the credibility of both witnesses was seriously

contested at trial.  Guercio, who was formerly friends with Williams, testified that he was

regularly using heroin at the time of the incident.  Tr. 1263-65.  He also testified that he decided

to testify against Williams only after discovering that Williams had cooperated with the state in a

gun trafficking case against Guercio.  Tr. 1304-06.  Guercio hoped to receive a sentence

reduction for cooperating in the state case against Williams.  Tr. 1253-54.  Vanderlinde, who was

briefly Williams's cellmate, testified that he had been convicted three times of drug trafficking

and that he believed that testifying against Williams could result in a sentence reduction.  Tr.

1585-86, 1623-24, 1644.

   In essence, the case against Williams rested on the jury's determination of the

relative credibility of Madigan and Williams, whose testimony provided conflicting accounts of

the shooting.  Under these circumstances, the repeated incantation by the prosecutor of

Madigan's testimony that Williams had killed somebody (or people) in the past deeply

prejudiced the jury against Williams, tipping the scale towards Madigan's version of events.  I

reject the argument by the prosecution that,

> This is not a case where [Williams] was charged with intentionally
> killing somebody and therefore having, through false braggadocio,
> alleged that he had been a killer in the past is not as relevant to the
> conduct that he was charged with.  He didn't care what happened
> to the three girls in the car when he fired the gun, and he had
> experience using guns.  And that's what's relevant to the depraved
> indifference conviction.

OA Tr. 17.  Contrary to the prosecution's argument, this evidence – that Williams had discussed

killing somebody in the past – goes right to the heart of the depraved indifference charge.

   A habeas petitioner is entitled to relief only if the constitutional error at trial was

not harmless.  A constitutional error in a state-court criminal trial is harmless unless it has "a

substantial and injurious effect or influence in determining the jury's verdict."  *Fry v. Pliler*, 551

U.S. 112, 116 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).  In making a

determination of harmless error, the court "looks to the record as a whole, considering the overall

strength of the prosecution's case, the importance of the improperly admitted evidence, and whether the evidence was emphasized at trial." *Brown v. Keane*, 355 F.3d 82, 92 (2d Cir. 2004).

In considering the third prong of the prosecutorial misconduct inquiry – *i.e.* the certainty of the conviction absent the misconduct – I conclude that without the prosecutor's improper elicitation of prejudicial testimony and repeated references to it, the certainty of Williams's conviction is in dispute. For the same reasons, I conclude that no fairminded jurist could disagree that this misconduct was not "harmless" error. Accordingly, habeas relief on this claim is granted.

(2)     <em>Inadequate Curative Instruction</em>

Williams asserts that after the prosecutor improperly elicited testimony from Madigan regarding his admission to a prior uncharged murder, the trial court issued inadequate curative instructions, resulting essentially in the improper admission of that testimony. Pet. at 53-57. Williams raised this claim on direct appeal in the Appellate Division. Br. Def.-Appellant 65-97, Apr. 2, 2009, ECF No. 36, at 80-112. The Appellate Division summarily disposed of Williams's claim on the merits.[25] *Williams*, 854 N.Y.S. 3d at 542.

Due process demands that "state courts conducting criminal trials . . . proceed consistently with that fundamental fairness' which is 'essential to the very concept of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Lisenba v. California*, 314 U.S.

---

[25]     The Appellate Division held in its opinion:

> While the better course would have been for the prosecutor to have obtained a ruling from the trial court regarding the admissibility of all testimony she sought to elicit from the People's witnesses regarding the defendant's prior uncharged crimes before such evidence was introduced into the case, any resultant error was harmless.

*Williams*, 854 N.Y.S.2d at 542. However, this part of the opinion appears to address Williams's claim of prosecutorial misconduct in improperly eliciting Madigan's testimony rather than the trial court's error in handling the improper testimony after it was elicited. The opinion addresses Williams's claim of trial court error with the statement that Williams's "remaining contentions are without merit." *Id.*

219, 236 (1941)), *abrogated on other grounds by Perry v. New Hampshire*, 132 S. Ct. 716

(2012).  While "[t]he introduction of unfairly prejudicial evidence against a defendant in a

criminal trial is contrary to both state and federal law . . . not all erroneous admissions of such

evidence are errors of constitutional dimension."[26]  *Id.* (internal citations and quotation marks

omitted).  The introduction of such evidence does not deprive a defendant of due process

"unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions

of justice.'"  *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)); *Collins v. Scully*,

755 F.2d 16, 18 (2d Cir. 1985) ("[I]n order to prevail on a claim that an evidentiary error

deprived the defendant of due process . . . he must show that the error was so pervasive so as to

have denied him a fundamentally fair trial . . . .").

        Improperly admitted evidence renders a trial fundamentally unfair when two

conditions are satisfied.  First, the evidence's prejudicial impact must outweigh its probative

value.  *Cf. Dunnigan*, 137 F.3d at 125 ("Where the prejudicial evidence is probative of [an]

essential element in the case, its admission does not violate the defendant's right to due

process.").  Second, the improperly admitted evidence must be "sufficiently material to provide

the basis for conviction or to remove a reasonable doubt that would have existed on the record

without it."  *Id.* (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1998)).  In other words, "it

must have been crucial, critical, highly significant."  *Collins*, 755 F.2d at 19 (internal quotation

---

[26]      Under New York law, "[e]vidence of uncharged crimes is inadmissible where its only purpose is
to show bad character or propensity towards crime."  *People v. Arafet*, 13 N.Y.3d 460, 464-65 (2009); *People v.
Molineux*, 168 N.Y. 264 (1901).  But "when evidence of uncharged crimes is relevant to some issue other than the
defendant's criminal disposition, it is generally held to be admissible on the theory that the probative value will
outweigh the potential prejudice to the accused."  *Arafet*, 13 N.Y.3d at 465; *Molineux*, 168 N.Y. at 293.  A decision
to admit evidence of a criminal defendant's uncharged crimes or bad acts under *Molineux* constitutes a state
evidentiary rule.  Accordingly, "[a] habeas claim asserting a right to relief on *Molineux* grounds must rise to the
level of a constitutional violation . . . because *Molineux* is a state law issue."  *Roldan v. Artuz*, 78 F.Supp.2d 260,
276-77 (S.D.N.Y. 2000); *see also Estelle v. McGuire*, 502 U.S. 62, 67-67 (1991) ("[I]t is not the province of a
federal habeas court to reexamine state-court determinations on state-law questions.").

marks omitted).  When assessing the materiality of the improperly admitted evidence, the court

must review it "in light of the entire record before the jury."  *Id.*

On direct examination, the prosecutor asked Madigan, "[D]id [Williams] ever tell

you about any other experience he may have had with firearms?" Madigan responded, "A few

occasions he said that this isn't the first time that he's killed somebody.  That he's done it

before."  Tr. 1005.  Defense counsel objected and moved for a mistrial outside the presence of

the jury on the grounds of unfair prejudice and prosecutorial misconduct.  Tr. 1006-07.  While

admitting that the question of unfair prejudice was "close" and that it was "[i]nitially" inclined to

agree with defense counsel, the trial court denied the motion for mistrial.  Tr. 1011.  In denying

the motion, the trial court noted that "if we let things stand just as they are now, then I think there

is really prejudice," but "[i]f there are follow-up questions which reveal she has no idea whether

those events ever occurred, it softens the blow. . . .  When we look at her whole testimony, not

only continued direct, but cross-examination, then I think it might not be as bad as it appears to

me."  Tr. 1011.  Thus, at that point, it appeared as though the trial court intended to permit the

prosecutor to try to blunt the prejudice to Williams by allowing her to elicit from Madigan that

Madigan did not know whether Williams's claims that he had killed someone were true.[27]

Defense counsel then requested a curative instruction, while stating his position

that a curative instruction would not overcome the prejudice to Williams.  Tr. 1012.  When the

jury returned, the trial court issued a rather confusing instruction:

> [T]here was testimony from a witness just now.  I don't know what
> the basis for it was.  But testimony from this witness which

---

[27]     I am unpersuaded by the implicit argument that testimony by Madigan to the effect that she didn't
know whether Williams's statement was true softens the prejudicial blow of her testimony.  Unless she were present
for the alleged uncharged murder, Madigan of course would not "know" if the statements were true.  Indeed, her
testimony accusing Williams of admitting to a prior murder would likely have been *less* helpful to the prosecutor
had Madigan been present for that murder.

referred to other crimes.  You heard it.  I can't ask you – I'm going to ask you to put it out of your mind.  I can't ask you to take it back.  It's like ringing a bell and trying to unring it.

. . . .  I have no idea if she has any basis for making those statements.  No idea at all.

Now, I presume her credibility will be attacked on cross-examination.  But that's in the future.  [Defense counsel] is a very skilled lawyer.

But my point is that she has said something that has no place at all in this courtroom.  No place at all.  And I'm asking you to take that instruction very carefully.  Very carefully.  And we'll try to pick up where we left off here.  We'll have her back.

Look, when you're finally determining whether you believe or not her testimony . . . what do you do when you're trying to discern whether a particular witness is telling the truth?  What are the things you look at?  Credibility.  Do you consider past conduct, past convictions?  All those questions were aimed at what we're doing now.

You the jury, how do you discern whether a particular witness is telling the truth?  Is there any basis for making those statements?  Is there any basis for making the statements she has when she testifies?

. . .

Tr. 1014-15.

Defense counsel properly objected to this curative instruction on the ground that the trial court had suggested to the jury that "they can conclude, if they believe [Madigan], they can believe [Williams] previously killed someone" and requested that the trial court instruct the jury that "they should not consider that statement for the truth of it."  Tr. 1017-18.  A defensive trial court then engaged in a lengthy and testy exchange with counsel outside the presence of the jury.  Finally, the trial court instructed the jury, "you are to completely disregard what that witness said – okay? – just before we broke. . . .   It has no part in this case.  You are to completely disregard."  Tr. 1022.

34

Thus, the trial court's first response to Madigan's testimony suggested that the obvious prejudice it created could be ameliorated by more testimony on the topic. Then the first curative instruction suggested that it raised an issue of credibility. Then the second curative instruction purported to excise the testimony and the topic entirely.

The prejudicial impact of Madigan's testimony is clear. The critical question is whether, in spite of the curative instructions, it was "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *Dunnigan*, 137 F.3d at 125. The test for sufficient materiality examines both the extent of the evidence's prejudicial effect at trial and the strength of the state's other evidence. For, "[i]f there is not reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Argus*, 427 U.S. 97, 108 (1976).[28]

As a general proposition, the courts presume that juries are capable of understanding and following instructions. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987) ("The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process."). However, the Supreme Court has observed that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton v. United States*, 391 U.S. 123, 135 (1968). The Second Circuit has

---

[28]   *Argus* addresses improperly *suppressed*, as opposed to admitted, evidence. However, its standard for determining the materiality of improperly suppressed evidence extends to cases addressing improperly admitted evidence. *See Collins*, 755 F.3d at 18-19.

specifically held that "in some instances the improper introduction of evidence of a defendant's prior criminal record can constitute prejudicial error beyond the capacity of cautionary instructions to cure." *United States v. Fermin*, 32 F.3d 674, 677 (2d Cir. 1994); *United States v. Rinaldi*, 302 F.2d 576, 577 (2d Cir. 1962) ("Improper introduction of evidence of a defendant's past criminal record is ground for a new trial.  Cautionary instructions will not cure the error.").

Here, the initial curative instruction issued by the court was confusing, to put it charitably.  The court vacillated from telling the jury that it could not disregard the improper evidence – "I can't ask you to take it back.  It's like ringing a bell and trying to unring it." – to admonishing the jury to do just that – "[S]he said something that has no place at all in this courtroom.  No place at all.  And I'm asking you to take that instruction very carefully." – to suggesting the jury could consider it for its truth – "You the jury, how do you discern whether a particular witness is telling the truth?  Is there any basis for making those statements?  Is there any basis for making the statements she has when she testifies?"  Tr. 1014-15.  After a vigorous objection by the defense to the confusing nature of the instruction, the court issued a second curative instruction: "[Y]ou are to completely disregard what that witness said – okay? – just before we broke. . . .  It has no part in this case.  You are to completely disregard."  Tr. 1022.

Whatever capacity these instructions might have had to cure the prejudicial effect of the evidence was immediately blunted by the prosecutor's return to Madigan's testimony following the curative instructions.  Just moments following the court's instructions, the prosecutor asked Madigan, "The other things that he was telling you, you don't know any of those things to be true, do you, just what he told you?," to which Madigan responded, "That's all I know is what he told me."  Tr. 1023.  Defense counsel failed to object to this testimony.

36

This error appears to have been invited by the trial court.  Prior to instructing the jury to "completely disregard" Madigan's testimony, the trial court stated, in denying defense counsel's motion for a mistrial, that "[i]f there are follow-up questions which reveal [Madigan] has no idea whether those events ever occurred, it softens the blow. . . .  When we look at her whole testimony, not only continued direct, but cross-examination, then I think it might not be as bad as it appears to me."  Tr. 1011.  That statement was in obvious tension with the trial court's curative instructions, as it indicated that the parties could broach prejudicial testimony.

That tension helps to explain defense counsel's otherwise baffling return to Madigan's testimony during his examination of Williams.  Towards the end of his direct examination, defense counsel asked Williams, "You heard [Madigan] testify here last week that you told her you had killed a couple of people while you were in the service.  Is that correct?"  Tr. 1921.  Williams responded, "I never told her anything like that.  I heard her testimony.  Yes."  Tr. 1921.  Defense counsel then asked, "Did you ever kill a person when you were in the military?"  Tr. 1921.  Williams then responded, "I never killed a person in my whole life."  Tr. 1921.  During her cross-examination of Williams, the prosecutor responded to this line of questioning by asking, "Did you tell [Weiner] similar stories that you told [Madigan] that you killed people before?," to which Williams responded, "No."  Tr. 1926.

The coup de grâce to the trial court's inadequate curative instructions was the prosecutor's discussion of this evidence during summation.  In going back over Madigan's testimony, she commented: "Just like Rebecca said.  I don't remember Rebecca saying he killed anybody in the service.  She said, 'He told me he killed people before.'"  Tr. 2063.  Defense counsel failed to object to these statements.

The only reasonable conclusion that can be drawn from the trial record following the court's curative instructions is that, despite being officially stricken from the record, Madigan's testimony was *de facto* re-entered into the record.  The trial court's confusing instructions to both counsel and the jury resulted in the repeated reference to this prejudicial evidence throughout the trial, thereby nullifying the effect of the curative instruction that purported to strike the concededly "beyond the pale" testimony from the record.  These repeated references, and particularly the statements made by the prosecutor during her summation, explicitly signaled to the jury that they could consider this prejudicial evidence in their deliberations.

The other factor in assessing the materiality of the prejudicial evidence is the strength of the other evidence.  As discussed above, *see supra* pp. [ ]-[ ], the major factual fulcrum for the jury was determining whether Williams fired the gun (as Madigan testified), or Madigan fired the gun (as Williams testified).  In essence, the case against Williams rested on the jury's determination of the relative credibility of Madigan and Williams, whose testimony provided conflicting accounts of the shooting.  Under these circumstances, evidence that Williams had "killed" before was certain to have a material and prejudicial impact.  The repeated return to this evidence following the trial court's curative instructions, and the relative weakness of the state's other evidence, heightened the prejudice to Williams.  Taking all these considerations into account, I conclude that no fairminded jurist could disagree that the handling of this evidence amounted to an error "sufficiently material . . . to remove a reasonable doubt that would have existed on the record without it."  *Dunnigan*, 137 F.3d at 125.

A habeas petitioner is entitled to relief only if the constitutional error at trial was not harmless.  As discussed above, the case against Williams  relied heavily on Madigan's

testimony describing Williams's role in the shooting.  The resolution of the credibility contest between Madigan and Williams, who testified to radically different accounts of the shooting, was the central task of the jury.  The defective curative instructions issued by the trial court – which had the prejudicial effect of admitting evidence that Williams had "killed" in the past – no doubt had a dramatic negative impact on Williams's credibility.[29]  Accordingly, this evidence "had a substantial and injurious effect or influence" on the jury's verdict.  I conclude that no fairminded jurist could disagree that admission of this evidence was not "harmless" error, and grant habeas relief on this claim.

### b.    *Ineffectiveness of Appellate Counsel*

Williams asserts that his appellate counsel was constitutionally ineffective in failing to raise on direct appeal the deficiency of trial counsel in failing to object to the prosecutor's use of Madigan's stricken and prejudicial testimony during summation.  Pet. at 102-04.  Williams raised this claim in his *coram nobis* petition.  Br. Def.-Appellant, Apr. 2, 2009, ECF No. 38.  The Appellate Division summarily denied the claim on the merits, stating that Williams had "failed to establish that he was denied the effective assistance of appellate counsel." *Williams*, 65 A.D.3d at 1173.

The Supreme Court set forth the standard for claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  Under the first prong of the *Strickland* test, a petitioner must demonstrate that counsel's performance fell below an objective standard of reasonableness.  Under the second prong of the *Strickland* test, a petitioner must establish that there is "a reasonable probability that, but for counsel's errors, the result of the

---

[29]    Once again, I reject the prosecutor's argument at trial that the prejudicial effect of Madigan's testimony was lowered by her testimony that she didn't know if his admissions of murder were true.  Obviously, the prosecutor wanted the jury to conclude either that Williams had murdered in the past or had lied to his girlfriend about having murdered in the past.  Either inference undermined Williams's credibility in a trial that boiled down to a credibility contest between him and his girlfriend.

proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. Although the *Strickland* test was formulated in the context of an ineffective assistance of trial counsel claim, the same test applies to claims of ineffective assistance of appellate counsel. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994).

Appellate counsel does not have a duty to advance every non-frivolous argument that could be made. *Jones v. Barnes*, 463 U.S. 745, 754 (1983). As the Supreme Court has observed, "[e]xperienced advocates since time before memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Id*. at 751-52. A petitioner may, however, establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo*, 13 F.3d at 533. "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Id*. (quoting *Strickland*, 466 U.S. at 690).

"To establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that his claim would have been successful before the state's highest court." *Id*. at 534 (internal quotation marks, alterations, and citations omitted). Analogizing from the trial context, "[a] reasonable probability [in the appellate context] is one sufficient to undermine confidence in the outcome of the . . . appeal." *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001). This "outcome determination, unlike the performance determination,

may be made with the benefit of hindsight." *Strickland*, 466 U.S. at 694 (citing *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993)).

As discussed above, the prosecutor elicited testimony from Madigan that Williams had admitted to a prior uncharged murder.  That testimony was inadmissible and extremely prejudicial.  *See supra* pp. [ ]-[ ].  The prosecutor's continued references to it, even after a curative instruction from the trial court striking it from the record, only compounded its prejudicial effect.  *Id*. at pp. [ ]-[ ].  The prosecutor's explicit incorporation of Madigan's testimony into summation was particularly egregious, as it served as a powerful, unrebutted and uncorrected reminder of the stricken testimony and an erroneous statement that the jurors could rely upon that evidence in rendering their verdict.

I fail to see how appellate counsel could reasonably winnow out this argument on direct appeal.  In his brief to the Appellate Division, appellate counsel focused prominent attention on the prosecutor's elicitation of Madigan's testimony and the trial court's inadequate curative instruction.  Br. Def.-Appellant, at 76-83, 98-103, ECF No. 36, at 91-98, 113-118.  These errors were of constitutional magnitude.  They were significantly compounded by the prosecutor's return to this prejudicial evidence during summation.  The omission of the argument that trial counsel was ineffective by failing to object to the prosecutor's misconduct during summation cannot, in this context, be excused as part of a reasonable winnowing process.

A reasonable probability exists that the inclusion of this argument might have rendered Williams's appeal successful.  On direct appeal, Williams's counsel did highlight the prosecutor's misconduct in eliciting the prejudicial testimony from Madigan.  The Appellate Division explicitly addressed this misconduct by stating:

> While the better course would have been for the prosecutor to have
> obtained a ruling from the trial court regarding the admissibility of
> all testimony she sought to elicit from the People's witnesses
> regarding the defendant's prior uncharged crimes before such
> evidence was introduced into the case, any resultant error was
> harmless.

*Williams*, 854 N.Y.S.2d at 542.  This language suggests a measure of disapprobation for the

prosecutor's conduct in eliciting the challenged testimony about an uncharged murder but finds

the misconduct ultimately harmless.  If the court had been presented with the fuller picture – *i.e.*

evidence of the prosecutor's repeated incantation of this prejudicial evidence, and especially the

comment in summation that the prosecutor now admits was "outrageous" – there is a reasonable

probability that it may have concluded otherwise.  Accordingly, habeas relief on this ground is

granted.

### c.     *Cumulative Effect of Errors*

Williams asserts that the cumulative effect of the errors alleged in his petition

denied him his right to a fair trial.  Pet. at 112.  I treat this claim as exhausted because I conclude

that Williams's direct appeal to the Appellate Division fairly presented this argument in the

context of its harmless error analysis.  *See* Br. Def.-Appellant, Mar. 22, 2007, ECF No. 36, at

104 (arguing that the court must "consider the errors in the aggregate, and determine whether the

'cumulative effect' of the errors warrant reversal").  *Cf. Jimenez v. Walker*, 458 F.3d 130, 148-49

(2d Cir. 2006) (denying habeas relief on "cumulative trial-court error" claim because petitioner

"did not fairly present this claim to the state courts and may no longer do so").

"The Supreme Court has repeatedly recognized that the cumulative effect of a

trial court's errors, even if they are harmless when considered singly, may amount to a violation

of due process requiring reversal of a conviction."  *United States v. Al-Moayad*, 545 F.3d 139,

178 (2d Cir. 2008) (citing *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978); *Chambers v.*

*Mississippi*, 410 U.S. 284, 302-03 (1973)).  The "cumulative unfairness" doctrine "is also firmly

embedded in this Circuit's precedents."  *Id*. (citing *United States v. Guglielmini*, 384 F.2d 602,

607 (2d Cir. 1967)).  Here, I have already concluded that the prosecutor's elicitation of

Madigan's prejudicial testimony of a prior uncharged murder constitutes misconduct casting

doubt on the certainty of Williams's conviction.  I have further concluded that the trial court's

inadequate "curative" instructions, which essentially resulted in the improper admission of this

evidence, further undermined confidence in the certainty of Williams's conviction.  Finally, I

have concluded that the failure of Williams's appellate counsel to raise a claim of ineffective

assistance of trial counsel for failing to object to the prosecutor's egregious use of Madigan's

testimony during summation constituted constitutionally ineffective assistance.  Even if each of

these errors, committed in isolation, would not warrant new proceedings, "the total effect of the

errors . . . cast[s] such a serious doubt on the fairness of the trial that the convictions must be

reversed."  *Guglielmini*, 384 F.2d at 607.  Accordingly, habeas relief is granted on this ground as

well.

2.      *Williams's Non-Meritorious Claims for Habeas Relief*

Williams asserts that he is entitled to habeas relief on the following additional

grounds: (1) his absence from a critical stage of his trial; (2) a double jeopardy violation; (3)

improper admission of evidence of (a) Williams's prior federal conviction and (b) recovery of a

9mm handgun during an unrelated traffic stop; (4) prosecutorial misconduct in the form of

eliciting (a) evidence of Williams's prior federal conviction and (b) perjured testimony from

Vanderlinde regarding his motives for testifying against Williams; (5) newly discovered

evidence in the form of an affidavit from Guercio; (6) ineffective assistance of trial counsel; and

43

(7) ineffective assistance of appellate counsel in failing to argue that trial counsel was unprepared for trial.  I find these grounds to be non-meritorious and address each in turn.

　　　　　a.　　　*Williams's Absence from January 27, 2003 Proceeding*

For reasons that are not clear in the record, Williams was not produced at a January 27, 2003 conference,[30] at which his newly-retained counsel, Philip Murphy, was substituted for his appointed counsel, Brian O'Donahue (who remained to assist as second-chair).[31]  Conference Minutes, at 12-13, Jan. 27, 2003, ECF No. 11, at 90-91.  Although trial was set to begin that day, Williams's new counsel sought additional time to prepare.  *Id*. at 14, ECF No. 11, at 92.  The trial court expressed frustration at the substitution of counsel at such a late date and the prospect of additional delay.  *Id*. at 10-11, ECF No. 11, at 88-89.  Nevertheless, Murphy was able to secure a four-day adjournment of trial until January 31, 2007.  *Id*. at 19, ECF No. 11, at 97.

Williams argues that his presence at this proceeding was crucial because he could have explained the reasons why he needed to retain new counsel, applied for a longer adjournment to allow Murphy further time to prepare for trial, and objected to O'Donahue remaining as second-chair.  Pet. at 43-46.  Williams made this argument on direct appeal and the Appellate Division denied it on the merits, ruling: "The defendant's contention that he was denied his right to be present at an adjourned proceeding date is without merit because the proceeding at issue involved only questions of law or procedure."[32]  *Williams*, 50 A.D.3d at 710.

---

[30]　　　Williams asserts in his petition that he was being held in a holding cell about 15 feet from the courtroom throughout the entire proceeding, but was never brought out and his lawyers never came to see him.  Pet. at 90.

[31]　　　The trial court implicitly granted Murphy's request that O'Donahue remain on the case to assist because of his greater familiarity with the case.  Conference Minutes, at 15, ECF No. 11, at 93.

[32]　　　The Appellate Division gave explicit attention only to the state law aspect of Williams's claim and did not specifically address its constitutional dimension.  Nevertheless, the Appellate Division concluded its opinion by stating that Williams's "remaining contentions are without merit."  *Id*.  Accordingly, even absent separate analysis of the federal principles governing the claim, the Appellate Division adjudicated it on the merits for §

Under well-settled federal constitutional law, "a criminal defendant has the right 'to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *Cohen v. Senkowski*, 290 F.3d 485, 489 (2d Cir. 2002) (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)).  The right to be present is not absolute, however: "[I]t is triggered only when the defendant's 'presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'"  *Id.* (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)).  "Thus, there is no constitutional right to be present 'when presence would be useless, or the benefit but a shadow.'"  *Id.* (quoting *Snyder*, 291 U.S. at 106-07).  "The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."  *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (internal quotation marks and alterations omitted).

The Appellate Division's conclusion that due process did not require Williams's presence at the January 27, 2003 court proceeding was not an unreasonable application of clearly established federal law.  Williams's claim rests primarily on the premise that his presence would have changed the outcome of the proceeding by producing a longer adjournment of the trial, thereby affording new counsel greater time to prepare and obviating the need for prior counsel to remain as second-chair.  But there is no reason to think that Williams's presence or absence on January 27, 2003 had any relation to the court's openness to a lengthy adjournment.  In fact, many of the factual assertions and arguments that Williams laments being unable to make were presented by his counsel.  Murphy specifically advised the court that he didn't think the substitution of counsel was "a dilatory tactic on the family's behalf," Conference Minutes, at 7,

---

2254(d)(1) purposes.  *Harrington*, 131 S. Ct. at 785; *Francolino v. Kuhlman*, 365 F.3d 137, 141 (2d Cir. 2004) ("We have held that a state court decision need not mention a particular argument or explain the reasons for rejecting it, and that a claim was adjudicated on the merits where it was one of the remaining contentions that the Appellate Division stated were 'without merit.'") (internal quotation marks and citations omitted).

ECF No. 11, at 85, and the court expressed its understanding that Williams's family was "not comfortable with counsel's preparedness for trial or ability to conduct the trial," *id.* at 10, ECF No. 11, at 88.  Nevertheless, the court remained troubled by the belated request to substitute counsel and expressed concern about delaying trial, especially because two witnesses "had to be writted in from federal custody."  *Id.* at 9-10, ECF No. 11, at 87-88.  Murphy responded to the court's displeasure by offering to proceed in four days and requesting that O'Donahue remain on to second chair.  *Id.* at 12-13, ECF No. 11, at 91-92.  Therefore, Williams's presence would likely have been "useless" or futile, *see Cohen*, 290 F.3d at 489, and it was not unreasonable for the Appellate Division to conclude that his absence did not violate his right to a fair and just hearing.  Accordingly, habeas relief on this ground is denied.

> b.   *The Double Jeopardy Claim*

On May 28, 2001, about two weeks after the offense conduct at issue in this case, Williams was pulled over for speeding by state troopers in Orange County, New York.  New York State Police Continuation Sheet, ECF No. 11, at 62.  The troopers searched Williams's vehicle and discovered a 9mm Hi-Point handgun.  Pet. at 47.  Williams subsequently pled guilty to criminal possession of a weapon in the third degree before the Superior Court of New York, County of Orange.  Plea Minutes, ECF No. 11, at 68-77.

Williams complains that "[t]he High Point 9 mm pistol which was introduced in the Suffolk County trial was the same gun which had previously been dismissed in satisfaction upon petitioner's guilty plea in the Orange County case."  Pet. at 48.  He argues that the use of the same physical evidence – the 9 mm Hi-Point handgun – to support two different criminal charges violates the constitutional prohibition against double jeopardy.  Williams admits that this claim is unexhausted.  Pet. at 48; Mot. Stay & Abeyance, at 1, ECF No. 4.

The exhaustion requirement, codified at 28 U.S.C. §§ 2254(b) and (c), obligates a federal habeas petitioner to exhaust state judicial remedies before seeking relief from a federal court.  To exhaust state remedies, a petitioner must "fairly present" his federal constitutional clams to the highest state court with jurisdiction over them.  *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (internal quotation marks and alterations omitted); *Daye v. Attorney General of New York*, 696 F.2d 186, 191 (2d Cir. 1981) (*en banc*).  This requirement, which "springs primarily from considerations of comity" between the federal and state systems, affords the state system "the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Daye*, 696 F.2d at 91.

Even if a claim in a federal habeas petition has not been exhausted, a federal court may deem it exhausted if it determines there are no avenues available in the state judicial system for reviewing the claim.  28 U.S.C. §§ 2254(b)(1)(A)-(B) ("An application for a writ of habeas corpus . . . shall not be granted unless . . . the applicant has exhausted the remedies available in the courts of the State; or there is an absence of available State corrective process . . . ."); *Aparicio*, 269 F.3d at 90 ("When a claim has never been presented to a state court, a federal court may theoretically find that there is an absence of available State corrective process if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile.").  But this "apparent salve . . . proves to be cold comfort to most petitioners" because the finding that the claims can no longer be exhausted requires the federal court to deem the claims procedurally defaulted.  *Aparicio*, 269 F.3d at 90.

A habeas petitioner can overcome a procedural default if he can show both "'cause' for noncompliance with the state rule and 'actual prejudice resulting from the alleged constitutional violation.'"  *Smith v. Murray*, 477 U.S. 527 (1985) (quoting *Wainwright v. Sykes*,

433 U.S. 72, 84 (1977)).  A habeas petitioner establishes "cause" if he can show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 496 (1986).  He establishes "actual prejudice" if he can demonstrate "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

I deem Williams's double jeopardy claim exhausted as it is clear that it is procedurally barred under New York law.  *See St. Helen v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004) ("[E]ven if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law.").  Williams was "entitled to one (and only one) appeal to the Appellate Division and one request for leave to appeal to the Court of Appeals, both of which he pursued long ago."[33]  *Aparicio*, 269 F.3d at 91 (2d Cir. 2001) (citing N.Y. Crim. Proc. Law § 450.10); N.Y. Comp. Codes R & Regs. Tit. 22 § 500.20(a)(2) (permitting only one application for leave to appeal).  Williams failed to raise this claim during that state appellate review process.  Since any attempt by Williams to now present this claim in the state appellate courts would be futile, I deem this claim exhausted.

Williams asserts that he failed to raise this issue on direct appeal because his appellate counsel was ineffective and because he "discovered the issue after direct appeal and state collateral attacks had been finalized."  Pet. at 48.  The latter argument fails to constitute an objective factor that prevented Williams from raising his double jeopardy claim.  The Supreme

---

[33]     Since this claim is record based, Williams cannot raise it in a § 440.10 motion.  N.Y. Crim. Proc. Law § 440.10(2)(c) (barring a collateral attack on claims that could have been raised on direct appeal); *see also Aparicio*, 269 F.3d at 91 ("New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal.").

Court has, however, "acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to constitute "cause" to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). But "[n]ot just any deficiency in counsel's performance will do;" "the assistance must have been so ineffective as to violate the Federal Constitution." *Id*. "In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Id*. (emphasis in original). Moreover, "the principles of comity and federalism that underlie our longstanding exhaustion doctrine . . . require *that* constitutional claim, like others, to be first raised in state court." *Id*. (emphasis in original); *Aparicio*, 99 n.10 ("Under *Edwards*, ineffective assistance can establish cause for a procedural default only if it is itself a valid constitutional claim."). Williams failed to raise *that* constitutional claim – *i.e.* ineffective assistance of appellate counsel for failing to raise a double jeopardy claim on direct appeal – in state court. *See* Br. Def.-Appellant, Apr. 2, 2009, ECF No. 38 (*coram nobis* petition). Therefore, it is also procedurally defaulted and Williams asserts no cause to excuse the procedural default. Accordingly, habeas relief on this ground is denied.[34]

c.   <em>Improper Admission of Evidence</em>

Williams asserts that the trial court improperly admitted evidence that (1) he was serving a 30-month sentence on federal charges at the time of his state trial and (2) an unrelated traffic stop resulted in the recovery of a 9mm handgun from Williams's car. Pet. at 50-53, 57-59.

---

[34] As explained in the text, this claim is procedurally defaulted, but it is also plainly meritless. The Double Jeopardy Clause protects a criminal defendant from being placed in jeopardy twice for the same offense. But there is no constitutional impediment to the use of the same evidence in separate prosecutions for different offenses.

(1)      *Williams's Prior Federal Conviction*

Jose Vanderlinde, who was Williams's cellmate at the Metropolitan Detention Center ("MDC") in Brooklyn in June 2002, testified against Williams at trial.  At the time of his testimony, Vanderlinde was serving a fifteen-year federal sentence for conspiracy to sell heroin.[35]  Vanderlinde pled guilty to the charge in December 2000, Tr. 1584, and was in the MDC awaiting sentence when he began sharing a cell with Williams in June 2002, Tr. 1589. Vanderlinde and Williams shared a cell for less than three weeks.  Tr. 1589.

During her opening statement, the prosecutor informed the jury that Vanderlinde would be testifying for the prosecution.  She described Vanderlinde as cellmates with Williams "in a federal facility . . . for about three weeks."  Tr. 876-77.  She then explained that Vanderlinde would testify to hearing Williams confess to involvement in the death of Arena.  Tr. 878.  Defense counsel moved for a mistrial outside the presence of the jury on the ground that the opening statement improperly advised the jury that Williams was in prior federal custody. Tr. 881.  The prosecutor countered that the information that Williams was in prior federal custody was necessary because it was "inextricably interwoven" into the context of the conversation between Williams and Vanderlinde and was necessary to evaluate the truthfulness of Vanderlinde's testimony.  Tr. 882-83.  The trial court denied the motion for a mistrial.

Later, on direct examination, Vanderlinde testified that "one night [Williams] couldn't sleep.  And I said, 'What's going on?'  I said because he only doing thirty months.  I said, 'You can't sleep because of that?'"  Tr. 1590.  Defense counsel renewed his motion for a mistrial and the prosecutor repeated her prior arguments in support of the admissibility of the testimony.  Tr. 1590-94.  The trial court again denied the motion for mistrial.  Tr. 1596.

---

[35]      I have located a criminal case in the Southern District of New York with one of the defendant's names listed as "Jose Vander-Linder," also known as "Jose Vander-Linde," that appears to be Vanderlinde's case. *See United States v. Rebolledo*, No. 99-cr-1208 (S.D.N.Y.).

Williams raised this claim on direct appeal in the Appellate Division.  Br. Def.-Appellant 65-97, Apr. 2, 2009, ECF No. 36, at 80-112.  The Appellate Division denied the claims on the merits, finding that the evidence regarding Williams's federal custody "was properly admitted as background information necessary to complete the narrative regarding the defendant's confession [to Vanderlinde] and explain why he confessed."  *Williams*, 854 N.Y.S.2d 542.

Under New York law, evidence of prior crimes or bad acts is admissible if relevant to prove something other than the defendant's bad character or criminal propensity.  *Allaway v. McGinnis*, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) (citing *People v. Till*, 87 N.Y. 2d 835 (1995)).  A New York court may permit such evidence "as background material" and to "complete the narrative of events."  *Charles v. Fischer*, 516 F. Supp. 2d 210, 217 (E.D.N.Y. 2007) (citing *Till*, 87 N.Y. 2d at 836-37)).  I agree with the Appellate Division's conclusion that the trial court's decision to admit the testimony was proper because it was relevant to explain the context for Williams's alleged confession to Vanderlinde.  Accordingly, habeas relief on this ground is denied.

(2)     *Recovery of a 9mm Handgun during Unrelated Traffic Stop*

The prosecution called Trooper Michael Grogan to testify against Williams.  Grogan was one of the state troopers who pulled Williams over for speeding in Orange County, New York, about two weeks following the offense conduct at issue in this case.  Prior to calling Grogan to the stand, the prosecutor explained to the trial court, outside the presence of the jury, her intention "to ask [Grogan] limited questions with regard to the nine millimeter High Point weapon that was recovered from the defendant's vehicle."  Tr. 1387.  She argued that this

testimony was admissible because it was evidence that Williams possessed a 9mm Hi-Point

handgun on the night of the incident.  Tr. 1387.

Defense counsel then made an application to preclude the prosecutor from calling

Grogan to testify and to preclude the introduction of the gun on the ground that it was unduly

prejudicial.  Tr. 1389, 1391.  The trial court overruled the objection on the ground that

> there's been testimony from at least two witnesses, Miss Madigan
> and Mr. Guercio, referring to the gun.  And being in the possession
> of the defendant, etcetera, during the incident that they're
> testifying about or just subsequent to it. . . .  So I don't think the
> jury is going to be shocked or anything like that.

Tr. 1392.  During the prosecutor's direct examination of Grogan, she offered into evidence the

9mm Hi-Point handgun that was retrieved from Williams's car after Williams was pulled over.

Tr. 1399-40.  Outside the presence of the jury, defense counsel objected unsuccessfully on the

same grounds raised in his prior application to preclude the weapon.  Tr. 1400-01.  Williams

raised this claim on direct appeal in the Appellate Division, which summarily denied it on the

merits.[36]

The prejudicial impact of the firearm evidence was negligible.  Prior to Grogan

taking the stand, Daniel Guercio testified that, on the night of the incident, Williams told him he

shot at the car with a 9mm handgun.  Tr. 1229.  Evidence that, a few weeks following the

incident, Grogan discovered a gun of the same type and caliber that Guercio testified Williams

had claimed to have used on the night of the incident was probative of Guercio's credibility.

Besides, the critical issue at trial was whether Williams or Madigan had fired the gun, not

---

[36]      The Appellate Division opinion did not specifically address this claim, but it concluded its opinion
by stating that Williams's "remaining contentions are without merit."  *Francolino*, 365 F.3d at 141 ("We have held
that a state court decision need not mention a particular argument or explain the reasons for rejecting it, and that a
claim was adjudicated on the merits where it was one of the remaining contentions that the Appellate Division stated
were 'without merit.'") (internal quotation marks and citations omitted).

whether Williams owned the gun involved in the shooting.  Accordingly, habeas relief on this ground is denied.

### d.    *Prosecutorial Misconduct*

Williams asserts two additional grounds of prosecutorial misconduct.  First, he asserts that the prosecutor's opening statement improperly informed the jury that Williams had been in federal custody on an unrelated case.  He argues that this misconduct was amplified by her improper elicitation of testimony from Vanderlinde regarding Williams's prior federal conviction.  Second, Williams asserts that the prosecutor improperly elicited perjured testimony from Vanderlinde regarding his motives for testifying against Williams, thereby bolstering Vanderlinde's testimony.  He argues that this misconduct was later compounded by the prosecutor during summation, when she referred to Vanderlinde's perjured testimony.

### (1)    *Williams's Prior Federal Conviction*

Williams first argues that the prosecutor made improper statements in her opening statement and improperly elicited testimony from Vanderlinde regarding Williams's prior federal conviction.  Specifically, in her opening the prosecutor described Vanderlinde as cellmates with Williams "in a federal facility . . . for about three weeks." Tr. 876-77.  Defense counsel moved for a mistrial outside the presence of the jury, which the trial court denied.  Later, during direct examination, Vanderlinde testified that "one night [Williams] couldn't sleep.  And I said, 'What's going on?'  I said because he only doing thirty months.  I said, 'You can't sleep because of that?" Tr. 1590.  Defense counsel renewed his motion for a mistrial, which the trial court again denied.  Tr. 1590-91, 1596.  On both motions, the prosecutor represented that the fact that Williams was in federal custody was information necessary to understand the context of the conversation between Vanderlinde and Williams, and for the jury to evaluate Vanderlinde's

credibility.  Tr. 882-83, 885.  The trial court accepted this representation; upon defense counsel's

second motion, it explained "The fact that he's in custody, you know, the defendant, the jury has

to know that.  Just talking to someone in custody."  Tr. 1596.

                         Williams raised this claim for prosecutorial misconduct on direct appeal.

Although the Appellate Division's opinion did not explicitly address this claim, it stated:

"Testimony of a witness regarding the circumstances under which the defendant confessed his

guilt to him with respect to the instance offenses was properly admitted as background

information necessary to complete the narrative regarding the defendant's confession and explain

why he confessed."  *Williams*, 854 N.Y.S.2d at 542.  This holding addresses Williams's claim

that the trial court erred in admitting this evidence, not the claim that the prosecutor committed

misconduct in eliciting it.  Nevertheless, the court's reasoning that the probative value of this

testimony outweighed its prejudicial impact is relevant to evaluating the prosecutor's alleged

misconduct.  I fail to see how the elicitation of this evidence, unlike Madigan's testimony

regarding Williams's admission to a prior uncharged murder, "so infected the trial with

unfairness as to make the resulting conviction a denial of due process."  *Parker*, 132 S. Ct. at

2143.  This information enabled the jury to evaluate the credibility of Vanderlinde, who testified

that Williams had confessed to firing the gun at the car, the critical issue in dispute at trial.

Accordingly, Williams's claim of prosecutorial misconduct falters on this ground.

                                       (2)      *Vanderlinde's Perjured Testimony*

                         Williams admits that his prosecutorial misconduct claim on the ground that the

prosecutor elicited perjured testimony from Vanderlinde is unexhausted.  *See* Pet. at 67-68; Mot.

Stay & Abeyance, at 1.  I deem this claim exhausted as it is clear that it is procedurally barred

under New York law.  The error is apparent from the record and thus Williams should have

54

raised it in his direct appeal.  Williams asserts the same causes for this procedural default as he raised with his double jeopardy claim – that his appellate counsel was ineffective and because he "discovered the issue after direct appeal and state collateral attacks had been finalized."  Pet. at 67-68.  Both fail for the same reason.  That Williams only "discovered the issue" after concluding the appellate process fails to constitute an "objective factor external to the defense" that "impeded [his] efforts to comply with the State's procedural rule."  *Murray*, 477 U.S. at 496.  And while the ineffectiveness of appellate counsel may, in certain circumstances, suffice to constitute cause excusing procedural default, *that* constitutional claim must first be raised in state court.  Here, Williams failed to raise that constitutional claim – *i.e.* ineffective assistance of appellate counsel for failing to raise on direct appeal a prosecutorial misconduct claim based on the elicitation of perjured testimony from Vanderlinde – in state court.  That claim is also procedurally defaulted and Williams asserts no cause to excuse the procedural default.  Accordingly, habeas relief on this ground is denied.

e.      *Newly Discovered Evidence – Guercio's 2004 Affidavit*

Daniel Guercio testified at trial that on the night of the shooting Williams admitted to him that he had shot at Singh's car.  Tr. 1229.  On January 12, 2004 Guercio signed an affidavit relating to that testimony.  Guercio Aff., ECF No. 40, at 35.  The affidavit stated that throughout 2001 and for part of 2002, Guercio "used heroin and marijuana on a daily basis," and as a result his "head and thoughts were foggy."  *Id*.  Guercio indicated that he had informed the prosecutor and a Suffolk County detective of his drug use when they came to visit him prior to Williams's trial in December 2002.  *Id*.  He further indicated that he "stopped using drugs in 2002" and that his "head and thoughts are no longer foggy."  *Id*.

The affidavit also stated that "[o]n or about May 15, 2001, [Guercio] was a rear seat passenger in a car driven [b]y Eric Williams on the way upstate" and that "Rebecca Madigan was in the front passenger seat."  *Id*.  Guercio indicated that "[d]uring that drive Rebecca told [him] that she shot the gun on May 15, 2001, that Eric Williams was accused of shooting at the trial," and that Madigan "told [him] not to tell this to anybody."  *Id*.  He further indicated that a few days following the incident, Madigan told Guercio that

> she wanted to get a nurses uniform so that she could go to a hospital dressed as a nurse and kill Melissa Weiner because she thought that Melissa Weiner could identify Eric Williams as the driver of the car chasing the car in which Melissa was a passenger during the incident of May 21, 2001.

*Id*.

Williams argued in his § 440.10 motion that Guercio's affidavit constituted newly-discovered evidence warranting a new trial.[37]  § 440.10 Mot., ECF No. 39, at 10.  The state court denied the claim on the merits.  Decision and Order, *Williams*, No. 1289-2002 (Nov. 16, 2010), ECF No. 40, at 19-22.  Specifically, the court held that Guercio's affidavit did not constitute newly discovered evidence as it "in no way contradicts either his testimony or the original affidavit he gave to police in November 2001, both of which set forth defendant's detailed admissions to chasing the car, shooting his gun, and causing the car to flip over."  *Id*. at 20.  It continued that "[w]hatever Guercio may or may not have heard Madigan say, he has not retracted hearing defendant's admissions."  *Id*.  Moreover, the court found "Guercio's statement about remembering Rebecca Madigan's admission to being the actual shooter . . . highly suspect

---

[37]     In New York, the Criminal Procedure Law permits defendants to collaterally challenge their convictions on the basis that "[n]ew evidence [h]as been discovered since the entry of judgment . . . which is of such character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to the defendant."  N.Y. Crim. Proc. Law § 440.10(1)(g).

and merely impeachment material for Madigan."[38]  *Id*.  The court concluded that "[t]here is simply no probability of a different verdict if the contents of the 2004 Guercio affidavit were presented to a jury at a retrial."  *Id*.

Williams requested reconsideration of his § 440.10 motion.  Williams Appl. Recons., ECF No. 40, at 28-34.  The court reconsidered Williams's § 440.10 motion but denied it on the merits.  Decision and Order, *Williams*, No. 1289-2002 (June 23, 2011), ECF No. 43, at 24-29.  The court held that Guercio's affidavit did not constitute newly discovered evidence because "[t]he two issues, Guercio's drug usage and the admission attributed to Madigan, were raised at trial and cannot be said to have been subsequently discovered."  *Id*. at 26.  The court added that "[t]he Affidavit itself, unsupported by any other evidence, merely contradicts previous testimony and does not establish a probability that the result of a new trial would be different."  *Id*.  Finally, the court noted that "the proffered evidence lacks credibility," adopting the court's prior finding that it was "patently incredible."  The court explained its reasoning as follows:

> The Affidavit . . . was executed over two and [a] half years after the statement was allegedly made by Madigan and seven years prior to filing of the underlying motion.  It contradicts both Guercio's testimony at trial as well as the November 1, 2001 written statement he provided to the police.  The only explanation offered for the revelation of this purported newly discovered evidence is that, as of 2004, Guercio's "head and thoughts are no longer foggy."  There are "credibility shortcomings inherent in evidence of this nature" and defendant's claims are unsupported by the record at trial.

*Id*. at 26-27 (quoting *People v. Robinson*, 211 A.D.2d 733 (App. Div. 1995)).  The Appellate Division denied leave to appeal.

---

[38]    The court also held that the section of the affidavit regarding the nurse uniform was not newly-discovered evidence because "[t]his theory was presented to the jury and given little or no credence."  Decision and Order, *Williams*, No. 1289-2002 (Nov. 16, 2010), ECF No. 40, at 20; *see, e.g.* Tr. 2021 (defense summation regarding nurse uniform scheme).

"A claim 'based on newly discovered evidence ha[s] never been held to state a ground for habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Ortega v. Duncan*, 333 F.3d 102, 108 (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)). Accordingly, "[i]n order for habeas relief to issue, . . . a due process violation must have occurred at [Williams's] trial." *Id.* Here, Williams claims that Guercio perjured himself during trial by testifying that Williams had admitted to shooting the gun. But a "showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief." *Ortega*, 333 F.3d at 102 (citing *Sanders v. Sullivan*, 863 F.2d 218, 222 (2d Cir. 1988)). Rather, due process "is violated only 'if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (citing *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)).

In finding that Guercio's affidavit lacked credibility, the state court dismissed the contention that Guercio had perjured himself at trial. A federal court can disagree with a state court's credibility determination only if it can "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); 28 U.S.C. §§ 2254(d), (e)(1). Here, I find neither the decision unreasonable nor the factual premise rebutted by clear and convincing evidence. Accordingly, habeas relief on this ground is denied.

f.   *Ineffectiveness of Trial Counsel*

Williams asserts that his trial counsel was constitutionally ineffective on the following grounds: (1) failing to conduct an investigation prior to trial; (2) proceeding to trial unprepared; (3) failing to properly inform Williams of the law; (4) failing to present a defense;

(5) failing to move to dismiss on double jeopardy grounds; (6) failing to object to the prosecution's use of perjured testimony; and (7) the cumulative effect of these errors.  Pet. at 79-100.

Williams raised the first, second, third, and fourth grounds of his ineffective assistance of trial counsel claim in his § 440.10 motion to vacate his judgment of conviction.  § 440 Motion, ECF No. 39, at 10.  The state court denied the claim on the merits, finding that "defense counsel was a strong advocate for defendant" and that "[t]he record proves that defendant received effective representation by counsel under both the Federal and State standards."  Decision and Order, *Williams*, No. 1289-2002 (Nov. 16, 2010), ECF No. 40, at 22. On reconsideration, the state court held that the claim was procedurally barred because the claimed defects were apparent from the record, and therefore Williams could have raised the issue in his direct appeal.  Decision and Order, *Williams*, No. 1289-2002 (June 23, 2011), ECF No. 40, at 27.  However, the court then proceeded to hold the claim was without merit.  *Id*. at 29. Williams admits that the fifth and sixth grounds of his ineffective assistance of trial counsel claim are unexhausted.[39]  *See* Pet. at 99.

Williams's claim of ineffective assistance of trial counsel on the exhausted grounds raises a threshold procedural-bar issue.  While the state court initially denied this claim (on these four grounds) on the merits, it later held, on reconsideration, that the claim was procedurally barred because Williams could have raised it on direct appeal.  Complicating the picture is the subsequent decision by the Appellate Division to deny leave to appeal.  That

---

[39]     Williams did not explicitly raise the seventh ground – the cumulative effect of trial counsel's errors – in his § 440.10 motion.  However, the *Strickland* standard for determining whether a petitioner received ineffective assistance of counsel directs the court "to look at the 'totality of the evidence before the judge or jury,' keeping in mind that '[s]ome errors [ ] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture.'"  *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001) (quoting *Strickland v. Washington*, 466 U.S. 668, 695-96 (1984)).  Accordingly, I "consider these errors in the aggregate" as part of the federal constitutional analysis.  *Id*.

decision denied leave to appeal from the first decision, rather than the decision upon

reconsideration.  Decision and Order, *Williams*, No. 1289-08, ECF No. 43, at 31.

"[A] procedural default does not bar consideration of a federal claim on . . .

habeas review unless the last state court rendering a judgment in the case clearly and expressly

states that its judgment rests on a state procedural bar."  *Harris*, 489 U.S. at 263 (internal

quotation marks omitted).  The Supreme Court has never squarely addressed the issue of whether

a state court's denial of leave to appeal constitutes a judgment for purposes of determining

whether a claim is procedurally defaulted.  But in *Greene v. Fischer*, the Court held that the last

state-court adjudication on the merits of a petitioner's claim was the affirmance of conviction by

the state intermediate appellate court, rather than "a decision by the state supreme court not to

hear the appeal – that is, not to decide at all."[40]  132 S.Ct. 38, 45 (2011).  The Second Circuit has

cited to *Greene* in holding that the affirmance of conviction by the Appellate Division was "the

last state-court adjudication on the merits of [petitioner's] claim," despite a subsequent decision

by the Court of Appeals denying leave to appeal.  *Vega v. Walsh*, 669 F.3d 123, 127 (2d Cir.

2012) (citing *Greene*, 132 S.Ct. at 45).  Both *Greene* and *Vega* were concerned with identifying

the state court opinion to which AEDPA deference should apply (*i.e.* determining whether the

state court's adjudication was "contrary to, or involved an unreasonable application of, clearly

established Federal law").  But the distinction recognized in both cases logically applies here.

After all, a habeas court cannot proceed to a merits analysis without first determining whether

"the last state-court adjudication" disposed of the claim on state procedural grounds.  This

reasoning compels me to conclude that the last state court to render a judgment in this case is the

---

[40]     Technically, what the Court described as "a decision by the state supreme court not to hear the appeal" was a decision by the state supreme court to dismiss a discretionary appeal on the grounds that it had improvidently granted leave.

§ 440.10 reconsideration court, rather than the Appellate Division, which denied Williams leave to appeal.

The § 440.10 reconsideration court first held that Williams's claim of ineffective assistance of counsel was procedurally barred because Williams could have raised it on direct appeal.  Decision and Order, *Williams*, No. 1289-2002 (June 23, 2011), ECF No. 40, at 27.  But the court then went on to hold the claim was without merit.  *Id*. at 29.  The Supreme Court has held that "[b]y its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."  *Harris*, 489 U.S. at 264, n.10; *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990) ("[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.").

Here, the § 440.10 reconsideration court did not specify whether its merits holding was in the alternative to its procedural bar-holding.  Nonetheless, the statement that the claim was procedurally barred was clear and express, and it was not hypothetical or ambiguous.  *Cf. Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 810-11 (2d Cir. 2000) (holding that "when a state court uses language such as '[t]he defendant's remaining contentions are *either* unpreserved for appellate review *or* without merit,' . . . the state court has not adequately indicated that its judgment rests on a state procedural bar") (emphasis added).  Thus, the § 440.10 reconsideration court's decision should be treated as an independent and adequate state law ground barring federal review of Williams's claim of ineffective assistance of trial counsel.

I deem exhausted Williams's claim of ineffective assistance of trial counsel on the two unexhausted grounds as it is clear that they are procedurally barred under New York law. Both alleged errors are apparent from the record and thus Williams should have raised them in his direct appeal. Williams asserts as cause for this procedural default that he "discovered these issues after direct appeal and State collateral attacks had been finalized." Pet. at 99. As noted above, that Williams only "discovered these issues" after concluding the appellate process and finalizing his state collateral attacks is not an "objective factor external to the defense" that "impeded [his] efforts to comply with the State's procedural rule." *Murray*, 477 U.S. at 496. Accordingly, Williams's claim of ineffective assistance of trial counsel on the two unexhausted grounds is denied.

### g.     *Ineffectiveness of Appellate Counsel*

Williams asserts that his appellate counsel was constitutionally ineffective on a number of additional grounds. First, he argues appellate counsel was constitutionally ineffective in failing to raise on direct appeal a claim of ineffective assistance of trial counsel. The purported deficiencies of trial counsel Williams argues appellate counsel should have raised are (1) proceeding to trial unprepared; (2) failing to conduct an investigation prior to trial; (3) failing to present a defense; (4) failing to move to dismiss on double jeopardy grounds; and (5) failing to object to the prosecution's use of perjured testimony.[41] Pet. at 101-02. Second, he argues appellate counsel was constitutionally ineffective in failing to raise on direct appeal a claim that

---

[41]     Williams admits that the last two arguments are unexhausted as they were not raised in his *coram nobis* petition. Pet. at 106. I cannot deem these arguments exhausted as New York permits multiple *coram nobis* petitions. Williams requests that his petition be stayed and held in abeyance while these arguments are exhausted, Pet. at 106, or in the alternative, to proceed only with the exhausted claims, Mot. Stay & Abeyance, at 2. I excise these two arguments from the petition and consider only the first three purported deficiencies of trial counsel in reviewing this ground of Williams's claim that his appellate counsel was constitutionally ineffective. *Rhines v. Weber*, 544 U.S. 269, 277 (2005) ("[I]f a petitioner presents a district court with a mixed petition and the court determines that stay and abeyance is inappropriate, the court should allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief.").

the trial court erred in setting a trial date four days from the retention of new counsel.  Pet. at 101-07.

Williams raised both of these grounds of his ineffective assistance of counsel claim in his *coram nobis* petition.  Br. Def.-Appellant, Apr. 2, 2009, ECF No. 38.  As discussed above, the Appellate Division summarily denied the claim on the merits, stating that Williams had "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Williams*, 65 A.D.3d 1173 (N.Y. App. Div. 2009).

The first ground is essentially an argument that appellate counsel failed to assert that trial counsel was unprepared for trial.  Pet. at 101-02.  This argument is meritless.  It is true that Williams's trial counsel agreed to proceed to trial only four days after being retained, but prior counsel remained to assist as second-chair.  Prior counsel, who was appointed to Williams upon his indictment, was familiar with the case, a point made by newly-retained counsel in requesting that appointed counsel remain to assist.  Conference Minutes, at 12, Jan. 27, 2003, ECF No. 11, at 82.  Moreover, the retention of appointed counsel as second-chair meant that Williams benefitted from his preparations for trial, particularly consultations with various experts, including ballistics and accident reconstruction experts.[42]  *See, e.g.*, *Ex Parte* Orders, ECF Nos. 15-16, 18-19, 21-22, 24-25, 27-28, 30-31, 33-34, 38-39; *see also* Conference Minutes at 12-13, Jan. 27, 2003, ECF No. 11, at 82-83.  Thus, it was not unreasonable for appellate counsel to choose not to raise this ineffective assistance claim.

Moreover, appellate counsel raised three non-frivolous legal issues on appeal.  In particular, appellate counsel focused significant attention on the prosecution's elicitation and the trial court's *de facto* admission (through inadequate curative instructions) of prejudicial

---

[42]     As for Williams's contention that trial counsel failed to present a defense, this argument is clearly belied by the trial record.  Williams's defense was that Madigan, not he, was the shooter.  He testified to this effect and trial counsel attempted to discredit conflicting testimony by the state's witnesses during cross-examination.

evidence, consisting of Madigan's testimony that Williams had confessed to killing people in the past.  As discussed above, this error was one of constitutional magnitude.  *See infra* pp. [ ]-[ ]. Appellate counsel is expected to focus on the stronger arguments.  *Jones*, 463 U.S. at 751-52. The omission of the particular argument that trial counsel was ineffective because he was unprepared for trial was not, compared with the other issues raised on direct appeal and compared to the ineffectiveness of trial counsel for failing to object during summation (on which I have granted habas relief), an error amounting to constitutionally ineffective assistance.[43] Accordingly, habeas relief on this ground is denied.

CONCLUSION

For the reasons stated above,  Williams's petition for habeas corpus is granted. Respondent is directed to release Williams within 45 days of this order unless the state declares its intention, within those 45 days, to retry Williams on the charges against him.

So ordered.

John Gleeson, U.S.D.J.

Dated: September 4, 2013
       Brooklyn, New York

---

[43]  Williams's second ground for relief on this claim is that appellate counsel failed to raise the claim that the trial court erred in setting a trial date four days from his procurement of new counsel.  Williams asserts that "by denying counsel's request for an adjournment and ordering the trial to begin 4 days from petitioner's procurement of counsel, the court violated petitioner's rights to due process and effective representation."  Pet. at 105.  This ground is indistinguishable from the first ground as it is another iteration of the argument that trial counsel was unprepared to go to trial.  I reject it for the same reasons.